BARTO *against* HIMROD and LOVETT.

| 8 | 483 |
| 131 | 508 |
| 8 | 483 |
| e173 | 113 |
| 173 | 116 |

The "Act establishing free schools throughout the state," (*Laws* 1849, *ch.* 140.) was unconstitutional and void, for the reason that the fact of its becoming a law was made to depend upon the result of a popular vote.

Laws must be enacted by the legislative bodies to which the legislative power is committed by the constitution. They can not divest themselves of the responsibility of their enactment by a reference of the question of their passage to their constituents. (*a*)

Had the submission of the free school act to the popular vote been constitutional, no provision having been made for ascertaining the result of the vote, the only evidence of its approval by the people would be the certificates of the town inspectors of elections. *Semble.*

It is not necessary that a special verdict should contain facts admitted by the pleadings. Those, together with the facts found by the jury, constitute a proper subject for consideration upon an appeal to this court.

This action was brought to recover the value of a wagon levied by virtue of a warrant issued by the defendants to collect several sums of money voted to be raised by tax in

(*a*) The question as to the constitutionality of the act establishing free schools throughout the state, was examined by the supreme court in the second, fifth and seventh districts, as well as in the case brought before this court. In the seventh district it was by a majority of the court held constitutional. (See 9

Barto *against* Himrod.

school district number one in Ulysses and Covert, Tompkins county, among which was the sum of $250, under the provisions of the "Act establishing free schools throughout the state," passed March 26, 1849. In the complaint the unlawful taking of the wagon in June, 1850, was simply alleged. In the answer the defendants alleged that they were the trustees of the school district: that on the third of May, 1850, a tax was ordered by a special district school meeting amounting to $380·10, which they in pursuance of their duty assessed upon the property and inhabitants of the district, and issued their warrant for the collection of the tax: that the plaintiff was assessed $25·23, and that upon his refusing to pay it to the collector, the latter levied upon his wagon. The plaintiff replied, alleging several matters which he insisted rendered the tax unauthorized, and among them that $250 of the tax was raised under the provisions of the above mentioned act, and that such act was not constitutionally enacted, and even if it ever did become a law, became so in a manner unknown to the constitution and contrary to its provisions, by virtue of a vote at large of the electors of the state in November, 1849, when no legislative body recognized by the constitution was in session. The illegality of this portion of the tax was alone relied upon in the subsequent proceedings in the action. The trial took place at the Tompkins circuit in September, 1850, before Mr. Justice SHANKLAND and a jury. The court submitted to the jury the question of fact as to the value of the property taken by the defendants, and they found the value thereof to be fifty dollars. The court thereupon reserved the residue of the case for consideration, and subsequently made an order as follows:

"The jury to whom the value of the wagon mentioned in the complaint in this cause was referred, having assessed

*Barb.* 680, *Johnson* v. *Rich*.) In the second and fifth, all the judges concurred in the opinion that it was unconstitutional. (See 15 *Barb.* 112, *Thorne* v. *Cramer*, and 122, *Bradley* v. *Baxter*.

Barto *against* Himrod.

the value thereof at fitfy dollars, and I having reserved the
questions of law arising in the cause for examination and
decision, do now decide and determine that the plaintiff
in this cause do recover against the said defendants the
damages assessed by the jury aforesaid, and also the costs
of this suit.

Dated October 11, 1850.       W. H. SHANKLAND,
Justice of the Supreme Court.

A judgment was thereupon entered in favor of the
plaintiff, which upon appeal was affirmed at a general term
held in the sixth district in November, 1851. The defend-
ants appealed to this court.

The cause was in the first place submitted upon written
argument at the June term, 1852, by

*A. Dana*, for appellants, and

*N. B. Smith*, for respondent.

As the case presented no general verdict, but simply a
special finding by the jury of the value of the property
taken, leaving all the other *facts* upon which the legal
rights of the parties depended as stated in the pleadings, it
became a point whether the case presented any legal ques-
tion upon which the court could act. In the first consult-
ation it was doubted by a majority of the court, whether it
could go behind the verdict and ascertain from the plead-
ings what facts were admitted in them, and then examine
those facts in connection with the fact found by the jury,
in order to determine what questions of law were presented;
and whether the special verdict should not, in order pro-
perly to present the legal questions to this court, contain
as well the facts admitted by the pleadings as those found
by the jury. The court, however, in December, 1852, re-
considered the question and ordered a reargument of the
case. Upon the reargument all the judges agreed that the

facts admitted by the pleadings, together with those found by the jury, presented the whole case in the proper form for the consideration of the court.

The second argument was an oral one by

*A. Dana*, for appellants, and

*S. Beardsley*, for respondent.

RUGGLES, Ch. J. — The act establishing free schools throughout the state, passed March 26, 1849, contains the following provisions:

" § 10. The electors shall determine by ballot at the annual election to be held in November next *whether this act shall or shall not become a law.*"

The 11th and 12th sections prescribe the manner in which the question is to be voted on by the people at the election: the 13th and 14th sections are as follows:

" § 13. The inspectors of election in the several election districts shall furnish a separate ballot box in which shall be placed all the ballots given for or against the new school law. The inspectors shall canvass the ballots and make return thereof in the same manner as votes given for the office of governor and lieutenant governor are by law canvassed and returned.

" § 14. In case a majority of all the votes in the state shall be cast against the new school law, this act shall be null and void; and in case a majority of all the votes in the state shall be cast for the new school law, *then this act shall become a law* and shall take effect, &c."

It will be observed that although the act directs the inspectors of the election in each town to canvass the ballots for and against the law, and to make return thereof in the same manner as votes for governor and lieutenant governor are canvassed and returned, it makes no such

Barto *against* Himrod.

provision for the county or state canvass; and it gives no direction to the county clerks, or to the county or state canvassers in relation to their duty. It provides that if a majority of all the votes in the state shall be against the law, it shall be void, and if in its favor, it shall be valid. But it fails entirely in pointing out the mode in which the general result of the popular vote is to be ascertained and determined. The general election law contains no provision applicable to this case. The state canvassers could not have been made answerable civilly or criminally for neglecting or refusing to canvass the votes and certify the result, because they were not required to do so by the statute itself, or by the general election law. Whatever they may have done in regard to it, was voluntary and unofficial.

Courts are in general bound to take judicial notice of public statutes. They have the means of knowing from the statute books, and therefore are presumed to know what laws are in force. But that rule is inapplicable to a case like the present. It can not be ascertained from the statute book whether the act of 1849 was adopted or rejected by the popular vote. The certificate of the state canvassers would not be legal evidence on that question, because it is not made so by the act, and because they had no authority to determine or certify the result of the vote. The act of 1849 does not prescribe the evidence by which it is to be known whether the act took effect or not. It was imperfect in its provisions, and there seems to be no mode of ascertaining by legal evidence the result of the vote upon it, except by the production and examination of the returns of the town inspectors of elections. These officers only were empowered to make the certificates.

In the present case the result of the popular vote was neither admitted on the pleadings nor established by evidence. And there was a total defect in the proof that the act had been adopted by the vote of the people.

We should therefore be compelled to affirm the judg-

ment of the supreme court for the want of this proof, whether the law is valid or not.

But upon the argument in this court, the case was rested mainly on the objection to the validity of the statute, on the ground that it was never enacted in form or spirit according to the constitution, and therefore never took effect, although it may have had the vote of the people in its favor.

This objection to the validity of the act has been several times under consideration in the supreme court. In one of the districts it was held to be constitutional and valid: in three others it was adjudged to be void.

The immediate practical importance of the question has been much diminished by the enactment in the usual form of " An act to establish free schools throughout the state," passed April 12th, 1851. (*Laws* 1851, *p.* 292.) To this statute, the objections made to the act of 1849 do not apply.

The question is however still highly important in regard to future legislation, and as such it has been carefully considered; and we are of opinion that the act in question is invalid, because the provisions contained in it in relation to free schools were never constitutionally enacted.

The legislative power in this state is vested by the constitution in the senate and assembly. (*Art.* 3, § 1.) The power of passing general statutes exists exclusively in the legislative bodies. In one instance only it is limited or qualified: " No law for the contracting of a debt shall take effect until it shall at a general election have been submitted to the people, and have received a majority of all the votes cast for and against it at such election." (*Art.* 7, § 12.) In this special and single case, the people by the constitution reserved legislative power to themselves. The legislature pass the bill in the usual form of enactment, but the statute has no force or authority until it is sanctioned by a vote of the people. In substance and reality the legislature propose the law. The people pass or reject it by a general vote. This is legislation by the people.

Barto *against* Himrod.

The exercise of this power by the people in other cases is not expressly and in terms prohibited by the constitution; but it is forbidden by necessary and unavoidable implication. The senate and assembly are the only bodies of men clothed with the power of general legislation. They possess the entire power with the exception above stated. The people reserved no part of it to themselves excepting in regard to laws creating public debt; and can therefore exercise it in no other case.

The act of 1849 does not on its face purport to be a law as it came from the hands of the legislature, for any other purpose than to submit to the people the question whether its provisions in relation to free schools " should or should not become a law," (*section* 10;) and by section 14 the act was to become law only in case it should have a majority of the votes of the people in its favor. Without contradicting the express terms of the 10th and 14th sections, it can not be said that the propositions contained in it in relation to free schools were enacted as law by the legislature. They were not law or to become law, until they had received a majority of the votes of the people at the general election in their favor, nor unless they received such majority. It results therefore unavoidably from the terms of the act itself, that it was the popular vote which made the law. The legislature prepared the plan or project and submitted it to the people to be passed or rejected.

The legislature had no power to make such submission, nor had the people the power to bind each other by acting upon it. They voluntarily surrendered that power when they adopted the constitution. The government of this state is democratic; but it is a representative democracy, and in passing general laws the people act only through their representatives in the legislature.

In *Johnson* v. *Rich,* 9 *Barbour,* 680, it was held by the supreme court in the 7th district that the act in question

Sel. IV.—62

was a valid law, on the ground that it was a conditional statute made to take effect upon the happening of a future contingent event, to wit: the vote of a majority of the people in its favor. It is not denied that a valid statute may be passed, to take effect upon the happening of some future event certain or uncertain. But such a statute when it comes from the hands of the legislature must be law *in presenti* to take effect *in futuro*. If the observations already made are correct, the act of 1849 was not such a statute. But if by the terms of the act it had been declared to be law from the time of its passage, to take effect in case it should receive a majority of votes in its favor, it would nevertheless have been invalid, because the result of the popular vote upon the expediency of the law is not such a future event, as the statute can be made to take effect upon, according to the meaning and intent of the constitution.

The event or change of circumstances on which a law may be made to take effect, must be such as in the judgment of the legislature affects the question of the expediency of the law: an event on which the expediency of the law, in the judgment of the law makers, depends. On this question of expediency, the legislature must exercise its own judgment definitively and finally. When a law is made to take effect upon the happening of such an event, the legislature in effect declare the law inexpedient if the event should not happen; but expedient if it should happen. They appeal to no other man or men to judge for them in relation to its present or future expediency. They exercise that power themselves and then perform the duty which the constitution imposes upon them.

But in the present case no such event or change of circumstances affecting the expediency of the law was expected to happen. The wisdom or expediency of the free school act, abstractly considered, did not depend on the vote of the people. If it was unwise or inexpedient before that vote was taken, it was equally so afterwards.

Barto *against* Himrod.

The event on which the act was made to take effect was nothing else than the vote of the people on the identical question which the constitution makes it the duty of the legislature itself to decide. The legislature has no power to make a statute dependent on such a contingency, because it would be confiding to others that legislative discretion which they are bound to exercise themselves, and which they can not delegate or commit to any other man or men to be exercised. They have no more authority to refer such a question to the whole people than to an individual. The people are sovereign, but their sovereignty must be exercised in the mode which they have pointed out in the constitution. All legislative power is derived from the people; but when the people adopted the constitution, they surrendered the power of making laws to the legislature, and imposed it upon that body as a duty. They did not reserve to themselves the power of ratifying or adopting laws proposed by the legislature, except in the single case of contracting public debt. They probably foresaw the evil consequences likely to arise from such a reservation. These are well and forcibly expressed by Mr. Justice Johnson in his opinion in the case of *Johnson* v. *Rich,* 9 *Barb.* 686. "I regard it," said he, "as an unwise and unsound policy, calculated to lead to loose and improvident legislation, and to take away from the legislator all just sense of his high and enduring responsibility to his constituents and to posterity, by shifting that responsibility upon others. Experience has also shown that laws passed in this manner are seldom permanent, but are changed the moment the instrument under which they are ratified has abated or reversed its current; of all the evils which afflict a state, that of unstable and capricious legislation is among the greatest."

For further illustration, let us suppose that the 10th and subsequent sections of the act of 1849 had directed the attorney general, or the archbishop of the Catholic church, or the common council of the city of New York, to certify

on the next general election day whether in his or their opinion that act ought to become a law; and had further provided that the act should or should not take effect according to such certificate: it can not be pretended that the statute would have become operative upon the making of the certificate in its favor. The constitution does not authorize the power of legislation to be so delegated. If the legislature can not delegate to an individual the authority to determine by the mere exercise of his judgment whether a statute ought to take effect or become a law, it follows as a necessary consequence that they can not delegate it to the whole people. The constitution has no more authorized it in the latter case than in the former. The people have limited the exercise of their own power to the modes pointed out in the constitution. And although they hold the ultimate sovereignty of the state they are subject like other sovereigns to established fundamental law. The people may change or abrogate that law, but they are bound by it until changed or abrogated.

The judgment of the supreme court ought to be affirmed.

WILLARD, J. The objection to the law is, that it was not enacted in the manner prescribed by the constitution, but was submitted by the legislature to the electors to determine by ballot, at the annual election in November, 1849, whether the act should or should not become a law.

By the 11th section of the 7th article of the constitution, the legislature is prohibited from creating any debts except such as are specified in the tenth and eleventh sections of the same article, unless in the manner therein mentioned; and no such law shall take effect until it shall at a general election have been submitted to the people, and have received a majority of all the votes cast for and against it, at such election. The section also provides that on the final passage of such bill in either house of the legislature, the question shall be taken by ayes and noes to be duly entered on the journals thereof, and shall be: " Shall this

bill pass, and ought the same to receive the sanction of the
people?" A subsequent clause in the same section pro-
vides that no such law shall be submitted to be voted on
within three months after its final passage, or at any general
election, when any other law, or any bill, or any amend-
ment of the constitution shall be submitted to be voted for
or against. This is the only case in which a law is *required*
to be submitted to the people; and there is no other part
of the constitution that recognizes, even by implication,
the right of the legislature thus to delegate their trust. It
is worthy also of remark, that in this case, the legislature
are required to assume all the responsibility which attaches
upon the passage of a law; for they are required to respond
in the affirmative, not only to the question whether the
bill shall pass their respective houses, but also whether it
ought to receive the sanction of the people. The members
of the legislature, therefore, can not in making a submis-
sion to the people under this section, elude the responsibility
which properly belongs to their station.

I pass by, as inapplicable to this discussion, the 13th
article of the constitution, which provides for the submis-
sion to the people, by the legislature, of proposed amend-
ments to that instrument. And I do not mean to lay much
stress upon the implication arising from the express pro-
vision to submit a law creating a debt to the people, and
the silence of the constitution in relation to submitting to
the people other matters of legislation. The maxim *Ex-*
*pressio unius est exclusio alterius*, is more applicable to
deeds and contracts than to a constitution, and requires
great caution in its application, in all cases.

The present question must be decided with reference to
our existing constitution. By that instrument the legisla-
tive power of the state is vested in a senate and assembly.
(*Const. art.* 3, § 1.) The enacting clause of all bills is re-
quired to be, " The people of the state of New York, *repre-*
*sented in senate and assembly*, do enact as follows." It is
not the people *at the polls*, who enact a law, but the people

represented in senate and assembly. Every bill before it becomes a law must receive the assent of a majority of all the members elected to each branch of the legislature, and the question upon its final passage must be taken immediately upon its last reading, and the yeas and nays entered on the journal. (*Ib.* § 14, 15.) The assent of two thirds of the members elected to each house is requisite to every bill appropriating the public moneys or property for local or private purposes. (*Art.* 1, § 9.) On the final passage in either house, of every act which imposes, continues or revives a tax, or creates a debt or charge, or makes, continues or revives any appropriation of public or trust money or property, or releases, discharges or commutes any claim or demand of the state, the question shall be taken by yeas and nays, which shall be duly entered on the journal, and three-fifths of all members elected to either house, shall, in all such cases, be necessary to constitute a quorum therein. (*Id. art.* 7, § 14.) These various provisions are designed to insure the full attendance of both houses, when a bill is passed, and to cause the members to feel their individual responsibility.

It is worthy of note that the act under consideration falls within the 14th section of article 7, just quoted, and required a quorum of three-fifths of all the members elected to both branches of the legislature to be present at the time of the final vote on its passage.

All the foregoing provisions contemplate that a law receives its vitality from the legislature. The representatives of the people are the law makers, and they are responsible to their constituents for their conduct in that capacity. By following the directions of the constitution, each member has an opportunity of proposing amendments. The general policy of the law, as well as the fitness of its details, is open to discussion. The popular feeling is expressed through their representatives; and the latter are enlightened and influenced more or less by the discussions of the public press.

Barto *against* Himrod.

A complicated system can only be perfected by a body composed of a limited number, with power to make amendments and to enjoy the benefit of free discussion and consultation. This can never be accomplished with reference to such a system when submitted to a vote of the people. They must take the system proposed or nothing. They can adopt no amendments, however obvious may be their necessity. With respect to the single case where the constitution *requires* a submission of the law to the people, the inconvenience is less felt, because only a single proposition is submitted, with respect to which no other answer can be given than yes or no. .

The law under consideration is in conflict with the constitution in various respects. Instead of becoming a law by the action of the organs appointed by the constitution for that purpose, it claims to become a law by the vote of the electors; and it claims that the popular vote may make it void and restore the former law. · All the safeguards which the constitution has provided are broken down, and the members of the legislature are allowed to evade the responsibility which belongs to their office.

It is not denied that a law may be passed to take effect on the happening of a future event. There are numerous examples of this species of legislation which are not obnoxious to any objection. The general appropriation bill each year affords numerous specimens. Thus an appropriation of four thousand dollars is usually made for the apprehension of fugitives from justice. The money is not payable until a fugitive has been apprehended, and the requisite evidence of the arrest, together with the amount of expenses, furnished to the proper officer. There is also a standing appropriation for the apprehension of criminals, which does not become payable until the criminal has been arrested, and the proof thereof has been produced. But in all these cases the law does not derive its power from the arrest of the fugitive or the apprehension of the criminal,

but from the legislature. Those cases are widely different from this. Here the law was not in force until the people had cast a majority of votes for it in a given way. In the other case, the law is in force whether there be a fugitive or a criminal or not. The future event gives no additional efficacy to the law, but furnishes the occasion for the exercise of its power.

The fundamental error of the court in *Johnson* v. *Rich*, (9 *Barbour*, 680,) consists in confounding laws which become operative at a future day, with laws which do not become operative until approved by a popular vote. In the first case, the law is complete when it has passed through the forms prescribed by the constitution, though its influence may not be felt until a subject matter has arisen upon which it can act. A law punishing murder with death, is inoperative until a murder has been committed. It is not, however, the murder which imparts efficacy to the law. The latter was complete when first enacted; and the murder merely affords the opportunity for awakening its energies. Had no murder ever been committed it would still be a law, threatening vengeance on the crime whenever it should be perpetrated.

It was far otherwise with the free school law. Had a majority of the electors failed to vote for it, no one pretends that it would have been a law. The voting by the electors does not furnish the occasion for the exercise of the power of the law, but was designed to give vitality to what was before lifeless. In short, the law was a mere proposition submitted to the people to be adopted or rejected as they pleased.

If this mode of legislation is permitted and becomes general, it will soon bring to a close the whole system of representative government which has been so justly our pride. The legislature will become an irresponsible cabal, too timid to assume the responsibility of lawgivers, and with just wisdom enough to devise subtile schemes of im-

posture, to mislead the people. All the checks against improvident legislation will be swept away; and the character of the constitution will be radically changed.

Without enlarging upon this subject, or reviewing the decisions in other states adverse to this mode of legislation, I think it is in conflict with our constitution.

Judgment affirmed.