Edgerton, C. J.,
dissenting: — I am unable to agree with the majority of the court in the conclusion to which they have arrived *417 on this appeal. The possible far-reaching results involved require that I shall give the reasons for my dissent. The case is thus: March 2, 1861,' Congress passed an act organizing Dakota Territory, which contained the following provisions:
“ Sec. 6. And le itfivrther enacted, That the legislative power '•‘.of the territory shall extend to all rightful subjects of legislation “ consistent with the Constitution of the United States-and the “ provisions of the act;” * * *
“ Sec. 12. And he it further enacted, That the legislative “ assembly of the Territory of Dakota shall hold its first session “ at such time and place in said territory as the Governor thereof “ shall appoint and direct; and at said first session, or as soon “ thereafter as they shall deem expedient, the Governor and legis- “ lative assembly shall proceed to locate and establish the seat of “ government for said territory at such place as they may'deem “ eligible, which place, however, shall thereafter be subject to be “ changed by the said Governor and legislative assembly.”
These provisions remain in force to this day without any material change. In the Revised Statutes passed June 22, 1874, section 12 was substantially re-enacted, except that portion which had been completely executed, and now reads as follows:
“ Sec. 1944. The seat of government of the territories of New “ Mexico, Utah, Washington, Colorado, Dakota, Arizona, and “ Wyoming may be changed by the governors and legislative “ assemblies thereof, respectively.”
In pursuance'of the authority thus conferred by section 12 of the Organic Act, the first Governor of the territory appointed as the place for holding the first session of the legislative assembly w’hat is how known as the city of Yankton. The first legislative assembly, by an act approved by the Governor, April 8, 1862, located and established'the seat of government on section 18, in town *418 ship 93 N., range 55 W., which' forms now a part of the city of Yankton; and on February 17, 1877, by the passage of chapter 1, of the Revised Codes, so changed the location as- to-include the whole of the city of Yankton. March 8, 1883, an act was passed appointing these defendants a commission to select, locate, and establish a seat of government for the territory, giving to them a discretion to select any place they should deem suitable, and thereon ioeate and establish such seat of government. That statute, so far as it affects the questions under consideration, is as follows:
“ Section 1. The seat of government of the Territory of Dakota “ is hereby removed from the city of Yankton, in the county of w Yankton and Territory of Dakota, and is located and established “ as hereinafter provided.”
“ Sec. 2. That ” (naming these defendants), u be, and they are u hereby, appointed commissioners for the purpose of locating the “ permanent seat of government and the capítol building of the “ Territory of Dakota.”
* * * * ******
“ Sec. 4. On or before the first day of July, 1883, the com- “ missioners, or a majority of them, shall select a suitable site for “ the seat of government of the Territory of Dakota, due regard “ being had to its accessibility from all portions of the territory “ and its general fitness for a capital, when at least one hundred “ thousand dollars shall be paid or guaranteed in money. If the “ amount be not paid in money, then its payment to the territory “ shall be secured by a bond, with good and sufficient .sureties, “ payable to the territory, which bond shall be approved by said “ commissioners, or a majority thereof. And after the site is de- “ termined upon as aforesaid, said commissioners shall secure good “ and sufficient title deeds of at least one hundred and sixty acres <c of land, upon which the capitol buildings shall be erected, and *419 41 a sufficient amount of said grounds shall be laid out into squares 41 and suitable landscapes, and the same is hereby declared to be 41 the permanent seat of government of the Territory of Dakota, 41 at which all of the public offices shall be kept, and.at which all 4‘ of the sessions of the legislature shall hereafter be held.”
***** *****
41 Sec. 16. Until the territorial capitel buildings shall be ready 4£ for occupancy as provided by this act, the territorial officers shall 4£ temporarily keep their offices, archives, books, records, and pa-4£ pers at the city of Yankton, unless the Governor shall designate 4£ some other place by written order, in which case the said officers 4£ shall remove their respective offices, together with the archives, 4£ books, records, and papers pertaining thereto, to the place so 4£ designated, within the time prescribed in such order.”
■“ Sec. 17. Chapter 1, of the Political Code, and all acts or 4£ parts of acts in any manner in conflict with this act or repug-4£ nant thereto, are hereby repealed.”
The defendants, having qualified, were proceeding to execute the duties and powers thus enjoined and conferred upon them, when this action was brought by the proper public officer to test their authority to thus act. It will be seen that an elementary question is presented. Can the Governor and legislative assembly delegate to these defendants the right to exercise power and authority expressly conferred by Congress upon the Governor and legislative assembly without power of substitution, express or implied? The question whether Congress derives all of its powers by delegation, or otherwise, may, perhaps, be an interesting one, but it has no application to this case, and indeed both parties admit that Congress derives its powers by delegation. This appellant says in his argument: “ In the United States the sovereignty re- “ sides in the people, and all legislative power is delegated. Con- *420 “, gress itself takes authority by delegation. The legislature of “ every state takes authority only by popular investiture, and the “ legislature of the territory stands ■ upon the same footing, with “ the qualification that sovereignty over the territories rests in “ Congress, instead of the people in them.” And the respondent says, alluding to this proposition: “.If I understand this argu- “ ment, it is that the people have delegated to Congress and that “ Congress *has delegated powers to the territories. So that the “ legislature of Dakota takes her powers two degrees removed from “ the people, — one step further in the descending scale. So that “ 1 take it as conceded that all the pqwers possessed by the Da- “ kota legislature and by the executive of Dakota are delegated “ powers.”
The first inquiry which suggests itself is the relation of the territory to the general government and to Congress. This question was at an early day a subject of contention in the highest court of the nation, and has received successive judicial interpretations, from the time of Chief Justice Marshall till now, so that the rule is tolerably well settled.
In American Ins. Co. v. Canter, Chief Justice Marshal says, in delivering the opinion of the court: “ In the mean time, Florida “ continues to be a territory of the United States, governed by “ virtue of that clause in the Constitution, which empowers Oon- “ gress to make all needful rules and regulations respecting the “ territory or other property belonging to the United States. Pe'r- “ haps the power of governing a territory belonging to the United “ States, which has not, by becoming a state, acquired the means “ of self-government, may result necessarily from the fact that it “ is not within the power and jurisdiction of the United States. “ The right to govern may be the inevitable consequence of the “ right to acquire territory. Whichever may be the source whence *421 “ the power is derived, the possession of it is unquestioned. * * * “ In legislating for them, Congress exercises the combined powers “ of the general and state government:”- 1 Pet., 542, 543.
The rule is now authoritatively defined and settled in National Bank v. Yankton, which is the latest expression from that court upon the question. The court says: “ It is certainly now too late “ to doubt the power of Congress to govern the territories. There “ have been some differences of opinion as to the particular clause “ of the Oonstitutiomfroin which the power is derived, but that it “ exists has always been conceded. * * All territory within “ the jurisdiction of the United States, not included in any state, must necessarily be governed by or under the authority of Con- “ gress. The territories core but political subdivisions of the out- “ lying dominion of the United States. Their relation to the “ general government is much the same as that which counties “ bear to the respective states, and Congress may legislate for “ them as the state does for its mu/nicipal organizations. The “ Organic law of a territory takes the place of the Constitution as “ the fundamental law of the local government. It is obligatory “ on and binds the territorial authorities, but Congress is supreme, “ and, for the purposes of this department of its governmental “ authority, has all the powers of the people of the United States, “ except such as have been expressly or by implication reserved in “ the prohibitions of the Constitution. -In the Crganic Act of “ Dakota there was not an express reservation of power in Con-u gress to amend the acts of the territorial legislature, nor was it “ necessary. Such a power is an incident of sovereignty, and con- “ tinues until granted away. Congress may not only abrogate “ laws of the territorial legislature, but may itself legislate directly “ for the local government. It may make a void act of the terri- “ torial legislature valid, and a valid act void. In other words, it “ has full and complete legislative authority over the people of *422 “ territories, and all the departments of the territorial govern- “ menta:” 101 U. S., 132, 133.
The condition of the territories is one of absolute dependence. The power of Congress over them is supreme, restricted, possibly, by some undefined limitations of the Constitution. Their very political existence may be abolished, or their territory may be carved up and attached to the surrounding states or territories. In the earlier organic acts for the government of the territories the legislative power was frequently, in the first instance, conferred upon the Governor and the Judges, all appointed by the President. See Organic Act for Arkansas, section 5; also for other territories.
I am unable to see that this case necessarily involves the discussion of any serious constitutional question. With great respect for the majority of the court, and for the learned Judge who so elaborately discusses grave constitutional questions in the majority opinion, it seems to me the proposition is so plain and so elementary, and the questions leading up to the principal question so thoroughly settled by judicial decisions, and so uncontested by text writers, there is very little chance for discussion. That Congress possesses the power to legislate for the territory, or to delegate the power of local legislation to the government of the territory, is not open to argument. That Congress might itself select and establish the seat of government, or might delegate that power to the Governor and legislative assembly, or to any other tribunal, is a proposition so well settled, and so plain, that the bare statement is enough to satisfy any intelligent legal mind. The question is not as to the power of Congress over the subject, but, Congress having delegated this power to select and establish and change the seat of government to the Governor and legislative assembly, the question is, in the absence of any express power of substitution, is there any implied authority in those tribunals to *423 again delegate this duty to any other tribunal, body, or person? And, second, have they attempted to do so in this instance * Whether the selection and location of a new seat of government involved in a change are in their nature legislative or administrative, or partake of both, does not affect the question. Congress saw fit, in the exercise of its authority over the territorial government, in addition to the general grant of power to legislate upon all rightful subjects, consistent with the Constitution of the United States and the laws of Congress, to enact specifically that upon this subject the power-to change the seat of government should rest with the Governor and the legislative assembly. These powers, whether legislative or administrative, required the exercise of discretion, judgment, and wisdom, and therefore, in the absence of express authority to that end, could not bé redelegated. What rule is plainer than that when delegated powers involve the exercise of discretion, of judgment, of wisdom, in the agent, whether a legislative or an administrative agent, that no implied power of substitution exists; but the duties must be performed by the very agent upon whom they are devolved. If the Governor and the legislative assembly can delegate to a commission the authority to-change the seat of government by the selection of a new locality, and designating it as the future seat, they may confer that power upon any person, in their discretion, and such authority may be again transmitted by such commission or person to others, or other, and from person to person, without limit. Where a delegated duty involves, as in this case, the exercise of those qualities of the mind known as discretion, judgment, wisdom, or patriotism, there is but one delegation of authority recognized in the law; that is, from the source or origin of the power, the principal to the agent, unless such agent shall be expressly, or by necessary implication from the appointment, clothed with the power of selecting and commissioning his substitute. “ Delegaba potestas non potest delegwri.” ■
*424 In Maxwell v. Bay City Bridge Co., 41 Mich., 453, the court say: “ It is familiar law that no trust can be delegated by “ the person or body on whom it is conferred, but that very “ person or body, and no other, must execute it. * * * ” Cooley says, in his Constitutional Limitations, page 139: u One of the settled maxims in constitutional law is that the “ power conferred upon the legislature to make laws cannot be “ delegated by that department to any other body or authority. “ Where the sovereign power of the state has located the authority, “ there it must remain, and by the constitutional agency alone the “ laws must be made, until the Constitution itself is changed. “ The power to whose judgment, wisdom, and patriotism this high “ prerogative has been intrusted, cannot relieve itself of the re-u sponsibility by choosing other agencies upon which the power “ shall be devolved, nor can it substitute the judgment, wisdom, “ and patriotism of any other body for those to which alone the “ people have seen fit to confide this sovereign trust.”
Congress, in almost every act for the organization of the territories, at least for the last 50 years, in addition to the general grant of powers to the territorial legislature, has also provided how the temporary and permanent seat of the territorial g'overnment should be located. Whatever might be the interpretation, had the general power, as expressed in section 1851, (substantially the same as section 6 of the Organic Act,) been the sole expression of the will of Congress, the passage of section 1944 must be considered as a grant or as a limitation of power, An old and correct rule of interpretation's: “Where a charter contains a general clause, “ which afterwards descends to special words which are consenta- “ nfeous to the general clause, the charter is to be interpreted ac- “ cording to the special words.”
It was contended by the appellants upon the argument, and the same view seems to be entertained in the majority opinion, that *425 tlie provisions of seetion 12, (1944) cited, so far as they relate to the location and change of the seat of government, are included in the grant of general powers ®f legislation, and that, therefore, this specific provision is to be given no force, and is to be regarded as merged in such grant of .authority to legislate. From this it is argued that the power to designate these persons to select a new seat of government may be implied. No doubt, in the absence of any other provisions upon the subject, the right to change the seat of government of either state or territory might be included in the authority to legislate. But I submit the rule of construction contended for is not the true rule. All parts of a statute should be given force, if possible, and must be presumed to have their just meaning. This specific grant .or delegation of power, in addition to the general powers conferred, is not to be ignored or treated as having no meaning or force. Congress must be presumed to have intended, by this separate and specific provision relating to the seat of government, just what is its plain and manifest meaning, to-wit: that the Governor and legislative assembly must exercise their judgment-and their wisdom in selecting, in locating, in determining, the eligibility of- the place for the seat of government of the territory, and must bring into play like functions in making the change. This duty, thus demanding of them the exercise of not mere mechanical force, Congress took care should be performed by these designated tribunals, and could not by them lawfully be conferred upon any one else.
The exercise of this duty by the tribunals selected by Congress cannot be. said to be in any just sense the exercise of original powers, or, as applied to government, of sovereign powers. The Governor and legislative assembly are tribunals, the mere creatures of Congress. By Congress they are created and clothed with all the powers which they possess. These powers are in the *426 largest sense mere delegated powers. They may at any time be resumed by the authority conferring them, or even after they are exercised may be repudiated and ignored. When Congress has thus said to its designated agents that they may da this thing which requires the exercise of the higher powers of intellect and spirit, how can it be said that Congress has impliedly authorized them to substitute some other agent to do the act expressly enjoined upon them?
It might be instructive to examine how 'Congress, in the different organic acts, has varied the mode of locating capitals in the territories. In some instances it has conferred the power solely upon the Governor and legislative assembly, while in other cases the place where the legislature shall, first meet is fixed in the Organic Act, and the temporary seat of government is located by the Governor and legislative assembly, and the permanent seat is established by law when ratified by the people. See section 13, of the Organic Act of Minnesota.
In the Organic Act for Minnesota the legislature may prescribe by law the manner of locating the permanent seat of government of said territory by a vote of the people. In Dakota, Congress changed the mode of location. Instead of providing that the manner of location may be prescribed by law, it intrusts the power to the Governor and legislature. It is a significant fact that in nearly every Organic Act for the territories Congress has provided in express terms how the place where the legislature shall first meet shall be determined, in what manner the temporary seat of government shall be located, and how and by whom the location may afterwards be changed.
In the Organic Act for Dakota, we find: First, that the Governor shall appoint and direct the time and place where the legislative assembly shall hold its first'session; second, that at the first *427 session, or as soon thereafter as they shall deem expedient, the Governor and legislative assembly shall proceed to locate and establish the seat of government for said territory at such place as they may deem eligible; third, that the seat of government may be changed by the Governor and legislative assembly.
Could the Governor, in the first instance, have delegated the power to appoint and direet the place where the legislature should hold its first session to any man or body of men* Could the Governor and legislative assembly, at the first session, have transferred their power to fix the seat of government to any man or tribunal? Can the Governor and legislature, ly act of the legislature, confer this power upon a body of men and invest them with all the discretion and powers conferred by Congress in section 1944, oí the Revised Statutes?
But it is claimed that in Nat. Bank v. Yankton, cited above, the Supreme Court declares also that the organic law of a territory takes the place of the Constitution as the fundamental law of the local government. How.does this change the question? If the Constitution of any state should contain a provision like that in our Organic Act, to-wit: that the seat of government may be changed by the Governor and legislative assembly, would any one claim that the duty thus especially enjoined upon the Governor and legislative assembly by the Constitution, could be by them transferred and placed upon another and different tribunal?
Onr attention has been called to this fact that legislatures frequently delegate certain powers to cities, towns, county commissioners, etc. I think a careful and impartial consideration of this class of cases will satisfy any one that these matters are largely of local and police regulation, and may properly be delegated to each locality; that such questions so delegated do not affect the whole people, but only localities, like local option laws. In referring to *428 the delegation of legislative powers to municipalities, Judge Cooley says: “The legislature, in these cases, is not regarded as dele- “ gating its authority, because the regulation of such local affairs “ as are commonly left to local boards and officers is not under- “ stood to belong properly to the state; and when it interferes, as “ sometimes it must, to restrain and control the local, action, there “ should be reasons of state policy, or dangers o'f local abuse, to “ warrant interposition:” Cooley, Const. Lim., 229.
In State ex rel. Sanford v. Court of Com. Pleas, 36 N. J. Law,72, the court say: “ In almost every city charter the right to regulate “ or restrain the sale of intoxicating liquors is expressly conferred; “ and it could be done only upon the theory that it is a police “ regulation, not strictly an exercise of law-making power.” And again: “Such enactments are regarded as police regulations, “ established for the prevention of pauperism and crime, for the “ abatement of nuisances, and the promotion of public health and “ safety.”
In referring to this and a similar class of cases, Mr. Cooley says: “ Such laws are known in common parlance as local option “ laws. They relate to subjects which, like the retailing of intox- “ icating drinks or the running at large of cattle in the highways, “ may be differently regarded in different localities, and they are “ sustained on what seems to us the impregnable ground that the “ subject, though not embraced within the immediate power of “ the municipalities to make by-laws and ordinances, is neverthe- “ less within the class of police regulations, in respect to which it “ is proper that the local judgment should control:” Cooley, Const. Lim., 148.
The language of Judge Catón, so relied upon, refers to local affairs, as a perusal of the whole case shows. The performance of the duty of selecting and locating the seat of government pertains *429 to the whole territory, and the right to delegate those duties bears no analogy to the delegation of the right of local legislation or the performance of some duty pertaining to mere local concerns. In regard to- mere local concerns the right to delegate authority is undoubtedly and necessarily infei’red from the power to legislate upon all rightful subjects. But while that implication is held to exist, and nowhere denied, no court extends such implication to matters affecting the whole state. If the authority thus conferred upon the Governor and legislative assembly to change the seat of government is legislative in character, then clearly it is legislation pertaining to the welfare of the whole commonwealth. The power to delegate authority for general legislation or authority to legislate upon any subject general to the entire people of the state is everywhere denied: Cooley, Const. Lim., 116; State v. Young, 29 Minn., 474-551; Barto v. Himrod, 8 N. Y., 483; Santo v. State, 2 Iowa, 203; Ex parte Wall, 48 Cal., 279; Brown v. Fleischner, 4 Or., 132; State v. Wilcox, 42 Conn., 364; Locke's Appeal, 72 Pa. St., 491; Rice v. Foster, 4 Harr., (Del.) 479; Lambert v. Ledwell, 62 Mo., 188; Lord v. Oconto, 47 Wis., 386; Meshmeier v. State, 11 Ind., 482; State v. Swisher, 17 Tex., 441. If such authority is to be deemed administrative rather than legislative, the rule is equally uniform and unquestioned that it cannot be -delegated: Cooley, Const. Lim., 205. “A trust created for any public purpose cannot be assignable at the will of the trustee.” See Maxwell v. Bay City Bridge Co. cited above.
In a well considered ease recently decided by the Supreme Court of Minnesota the correct rule is declared. It appears that the charter of the city of Minneapolis gave the city council such powers as enabled the council to make reasonable regulations as t© where or within what parts of the city the business of vending spirituous and malt liquors might be carried on. Dnder this *430 power the mayor was authorized-by the city council and did designate the districts or parts of the city where the sale should be allowed, which acts of the mayor were approved by the city council. A case involving this question was taken to the Supreme Court, and in the opinion the court say: “But this power to “ regulate is vested in the city council. It is a power which they “ cannot delegate to any person or officer. It is a legislative act “ which they must perform themselves, and they can only exercise “ it by ordinance enacted in the manner prescribed in the charter. “ Of course, they may impose mere executive or ministerial duties, “ such as approving the bond, receiving license fee, and issuing “ the license, on certain officers, as they have done in the present “ case. These are mere executive and ministerial acts to be per'- “ formed in the execution of the ordinance; but they cannot dele- “ gate their legislative powers. The ordinance, in that respect, “ must be complete when it leaves the hands of the city council. “ The limits within which the sale of liquor should be confined is “ a matter which the council must determine: It calls for the “ exercise of legislative discretion. They canno more remit to the “ mayor the riglit to determine this than they can the question of “ the amount of the license fee. But this is, in effect, what they “ have done in this case:” In re Wilson, 19 N. W. Rep., 725.
I now arrive at the question: Does this act of the legislative assembly undertake to confer upon these defendants the power to change the seat of government from Yankton, the former location, to some other district of country, to be by them selected and designated? If it does, then it is a clear delegation of the power conferred by Congress upon tile Governor and legislative assembly, and is void, and the duties thereunder cannot lawfully be performed by them. All of the duties to be performed by the defendants other than the selection of the seat of government depend upon such selection, and if the authoritv thus to select is wanting. the *431 whole statute fails — there will remain no duty which the defendants’ can perform under the act. "We are to give this, like other statutes, a reasonable interpretation. "We are to view it in the light of common sense. We should endeavor to discover its real intent and meaning, upholding it, if we can, but unhesitatingly pronouncing its invalidity, if it shall be so found. First, let us inquire what is its purpose? For wliat purpose was it framed and proposed? Clearly for the purpose of effecting a change in the seat of government. It so declares. The Governor and legislative assembly were authorized to change the seat of government from Yankton, the then location, to some other place; they were seeking to do so. Did such enactment effect the change? If it did, then the change was made by the tribunal authorized to make it, but if the enactment left it to these defendants to effect such change, then it was merely an enactment clothing them with the power to do what suck tribunal had been selected and empowered to do. We may gain some light in seeking the proper construction of this statute by ascertaining the meaning of the term “may be changed,” used in the law of Congress. Webster defines the-verb change ”-as “to put one thing in the place of another,” “ to exchange,” “ to alter or make different,” “ to cause to pass, from one state or place to. another.” To effect a change in the seat of government necessitated the substitution of another place for Yankton, the then seat. No change would or could be effected without and until such other place was thus substituted. Declaring the seat of government removed from the city of Yankton did not effect a change. A removal could only be made by the substituting of some other district of country in lieu of the city of Yankton. The very gist and essence of the change was the selection and location of another place or district other than the city of Yankton. Now, by this enactment the defendants were appointed, for the purpose of doing that very thing which was essential and *432 absolutely requisite to effect a change in the seat of government. Section 4, in express terms, provides that “ the commissioners, or “ a majority of them, shall select a suitable site for the seat of “ government of the Territory of Dakota, due regard being had to “ its accessibility from all portions of the territory, and its general “ fitness for a capital.” Undoubtedly, this was conferring upon these defendants powers which required the exercise of discretion, of judgment, of wisdom, of patriotism; and it was putting upon them the performance of duties expressly enjoined upon the Governor and legislative assembly.
It seems to me that no other view can be taken of this enactment. The attempt was made to evade the act of Congress; to defeat its provisions. This was supposed, no doubt, to be accomplished by the provisions of this act, which declared the seat of government removed from the city of Yankton, and which repealed the former act of the legislative assembly locating and establishing the permanent seat of government at Yankton. But such attempt was futile. Until the minds of the legislators and Governor had, in the forms prescribed by law, concurred in selecting a suitable site for the seat of government, and manifested such concurrence in the legal mode, no removal did or could take place; and there was no more authority to confer upon these defendants the performance of a part of the duty, than there was to confer upon them the whole of the duty prescribed by Congress to be performed by the Governor and legislative assembly. . No one would contend for a moment that, in direct terms, the legislative assembly could by law confer upon these defendants the power to change the seat of government. What cannot be doné directly, can no more be done by indirection. As we have seen, to effect a change in the seat of government,,a determination to remove it from the city of Yank-ton is necessary, and a selection and its location upon or in another district is essential.
*433 In this act the legislative assembly went so far as to determine upon its removal, but failed to select a place to which it should be removed. This latter duty, essential as it is to effect a change, was put upon these defendants. It would have been just as valid for the Governor and legislative assembly to have delegated to these defendants the power to determine whether it should or should not be removed, as to confer upon them .the other duty — of selecting a suitable site to which such removal could be made. There was no power conferred upon the legislature and Governor to repeal the act locating the seat of government, and thus to cause an inter-regnum to exist, during which no seat of government was designated whereat the governmental functions were to be performed. The power given was to change; that is, to substitute another place for the place theretofore fixed upon. Now, necessarily, such change required the location of a new seat of government, and, necessarily preceding that, there must have been the selection of such new seat. Such selection involved the exercise of those qualities which could not be delegated. Still, we find in this act that these defendants are appointed-for the express purpose of locating the seat of government — the new seat. Therefore, they are appointed to do the precise thing which the Governor and legislative assembly are authorized and empowered to do. This is a clear and unquestioned attempted delegation of such powers as cannot, by any rule of law, be delegated. It is an evident attempt at evading the plain letter as well as the spirit of the law of Congress, and ought to be barren in its results.
Let us illustrate: Suppose these gentlemen had never qualified or'acted, and no others had been appointed in their stead, would the seat of government have been changed? "Would any one contend for a moment that a change.could have been effected without their action? If so, where to? The seat of government could not *434 have been, changed from Yankton into space. It would not have been changed by annihilating the seat of government. Again: Suppose the commission had selected Yankton as the most eligible place, in their judgment, — which, under the law, they might do,— would there have been a change? This illustrates how strange and singular is the construction sought to be put upon this statute, in 'an attempt to sustain it, by the argument that the seal: of government was by the law changed, and not by these defendants. It would be a bolder, if not a more conclusive, legal proposition, to claim the right to delegate these delegated powers.
It is urged strongly that in determining this question of the legal construction of the organic law of this territory, we should consider/* the convenience of such delegation, the obvious difficulties in the way of a direct selection by the legislature.”
Judge Story lays it down as a rule of great importance, ** not to enlarge the construction of a given power beyond the fair scope of its terms, merely because the restriction is inconvenient, impolitic, or even mischievous:” Story on Const., Sec. 425. “ Courts have nothing to do with the argument of inconvenience: “People v. Morrell, 21 Wend., 583. ** If the right claimed is conferred by implication, such implication must be a necessary, not a conjectural or argumentative, one:” Field v. People, 2 Scam., 83.
Looking to the rules which govern in determining the power of municipal corporations, (and they are authoritative in this case,) we find it stated that ** the reasonable presumption is that the state has granted, in clear and unmistakable terms, all that it has de-. signed to grant at all:” Cooley on Const. Lim., 234, 235.
** It must be taken for settled law that a municipal corporation ** possesses and can exercise the following powers, and no others: ** Fi/rst, those granted in express terms; second, those necessarily ** implied, or necessarily incident to the powers expressly granted; *435 “ third, those absolutely essential to the declared objects and pur- “ poses of the corporation — not simply convenient, but indispen- £< sable:” Merriam v. Moody, 25 Iowa, 163.
“ The general rule is, that a delegated power can be redelegated, “ in the absence of an expressed right of substitution, only when u it is customary, necessary, or otherwise fairly to be presumed “ from the circumstances surrounding the transaction:” Story on Agency, Sec. 14,
Judge Bronson says, iu Oakley v. Aspinwall, 3 N. Y., 568: “ Believing, as I do, that the success of free institutions depends ,££ on a rigid adherence to the fundamental law, I have never ££ yielded to considerations of expediency in expounding it. There ££ is always some plausible reason for the latitudinarian construc- “ tions which are resorted to for the purpose of acquiring power; ££ some evil to be avoided, or some good to be obtained, by push- “ ing the .powers of the government beyond their legitimate boun- “ dary. It is by yielding to such influences that constitutions are “ gradually undermined, and finally overthrown. My rule has ££ ever been to follow the fundamental law as it is written, regard- ££ less of consequences. If the law does not work well people can ££ amend it, and inconvenience can be borne long enough to await ££ that process. But if the legislature or the courts undertake to ££ cure defects by forced and unnatural constructions, they' inflict ££ a wound upon the constitution which nothing can heal. One ££ step taken by the legislature or the judiciary, in enlarging the £‘ powers of the government opens the door for another, which will ££ be sure to follow; and so - the process goes on, until all respect ££ for the fundamental law is lost, and the powers of the govern- “ ment are just what those in authority are pleased to call them.”
The following rule is invoked by the appellant, and approved in the opinion of the majority of this court: “ If wisdom is to be *436 “ gained from the teachings of the past, and judicial decision is to “ be made in the light of governmental experience; if, as Catón “ said, we may ‘ feel warranted in looking at the past to see what u kind of laws legislative bodies have been in the habit of passing,’ “ in order to determine what are the proper limits of legislative “ authority, the attention of the court is now. respectfully invited “ to a line of precedents upon the specific point'in question which “ is without break or flaw, and absolutely authoritative in exam- “ pie.”
Let this rule be rigidly applied to the determination of this case. Certain precedents are claimed for the location of capitals by commissioners: First, by certain states; second, by territories; third, by Congress. A careful examination of all the cases cited will show whether these supposed precedents support the theory of the appellants or of the respondents. The state cases are Illinois and Nebraska; the territorial cases are Montana, Colorado, and Iowa; and the further case cited is that of the location of the federal capital. The appellant claims that each of these are cases in point in determining the application of the above rule.
In the case of Illinois the facts were these: The constitution of the state expressly authorized and required the legislature to appoint a commission to select certain lands, expected to be donated by Congress, upon which should be located the permanent seat of government. How this case can be twisted into a delegation of delegated powers is more than I can comprehend. The constitution was the expressed will of the sovereign. The legislature acted in accordance with that express will. Congress made the expected cession. The agents, authorized by the principal to be appointed, selected the lands out of such cession, whereon the seat of government was located. In the case of Illinois, then, all that can be claimed for it, and all that it is, treating *437 the constitution as the voice of the sovereign people, the principal expressly conferred upon their agents — the legislature — the authority to, and made it their duty to substitute, for tbe purpose of the selection of such lands as should be granted by tbe government, other agents of tbe people.
In the case of the state of Nebraska its then constitution contained no provision in relation to the seat of government, except that tbe legislative assembly should meet at Omaha at its first session. The state possessed certain lands, situated within tbe limits of-certain counties. These lands were limited in area. Tliey had been granted to tbe state by the general government. It was de--tennined to make them available for tbe erection of public buildings and thé location thereon of the seat of government, and tbe state legislature authorized certain state officers, to-wit: the Governor, Secretary, and another, to select from these lands a section most suitable on which to build a city, and constituted it tbe seat of government for the state; and thereafter, by express provision in the subsequently adopted new constitution, fixed the locality as the permanent seat of government. It will be observed in tbis. instance that no direction or prohibition was contained in tbe con-, stitution governing or prescribing the duty of the legislature in. this regard. They were the representatives of the sovereign power, —the principal; except as limited in the constitution their voice - was the voice of the principal. The powers which they exercised were exercised by them possessing all power which the people-possessed. This is the nearest in legislative precedent of any of' the instances cited, but clearly distinguishable from this legislation, where the Governor and legislative assembly of tlie territory are exercising merely such powers as have been expressly or by necessary implication conferred upon them by the source of power,, the Congress of the United States.
The next case is that of Iowa.. On. -Iannary 21,.1839,.the tern- *438 torial legislature passed an act authorizing a commission to select a location for the seat of government, restricting them to the county of Johnson. On the same day a supplemental act was passed, which provided that no further steps should be taken, after the selection and report thereof to the Governor, until the’ consent of the United States should be obtained, and also authorized the Governor to apply to Congress for a donation of four sections of land on which to locate the seat of government; and also, on the same day, by -resolution, instructed the Delegate to Congress to ask for such donation of land on which to locate the seat of government, tobe selected by the commissioners; thus showing beyond . controversy that nothing could be, or was intended to be, done until Congress had acted and consented to this mode 'of locating the seat of government.
It will thus be seen that in the Iowa case, the commission was limited to a single county, and the legislature provided that nothing should be done until the consent of the United States was obtained. Congress did consent, and furnished the means to carry into execution the act of the Iowa legislature before a step was taken towards the location of the site of the capítol. "With the act of the Iowa legislature constituting the commission before Congress, and waiting its approval, Congress approved the mode by furnishing the land to be selected under the authority of the territorial legislature, and not by the Governor and legislative assembly. It was an emphatic and unmistakable approval,which, to that extent, amounted to a modification of the original Organic Act of Iowa.
The next case cited is that of Montana. Section 1945, of the Kevised Statutes of the United States, provides as follows: “ That “ the seat of government shall not be at any time changed except “ by an act of the assembly, duly passed and approved, after due *439 “ notice at the first general election thereafter, by a majority of “ the legal votes cast on that question.” When the capital of that territory was changed, no commission was created, or sought to be created, but an act to change the location passed the assembly which was approved by a majority of the legal votes cast on that question, in exact accordance with the provisions of the Organic Act.
The appellants’ next case is that of Colorado. In that case the location was restricted by the legislature to the town of Colorado. I-n other words, the legislature designated the town of Colorado as the capital, and appointed commissioners to designate the location of the territorial buildings within such town. Great stress was laid by the counsel upon the act of Congress authorizing the appointment of a commission to survey, limit, and define the boundaries of a district of country 10 miles square, which “ may by cession of particular states and the acceptance of Congress become the seat of government of the United States.” See Article 1, Sec. 8, of Constitution of the United States.
Where this district should be located, and where the permanent seat of government should be established, early attracted the attention of Congress. A partial review of the history of this act may be instructive. Hamilton was Washington’s secretary of the treasury. He was anxious to secure the passage by Congress of certain financial measures, and among them the assumption'by the general government of the debts contracted by the several colonies or states for the maintenance of troops duri'ngthe war. He imagined that the stability of the new government'depended on the passage of these measures. The northern members very generally favored assumption. The Virginia members, with one exception, opposed it, but were anxious to secure the capital on the Potomac. Harrisburg, Baltimore, New York, Germantown, Philadelphia,Wright’s Ferry, on the Susquehanna, and some point near Georgetowm, on *440 the Potomac, were the contending places for the seat of government.
A late biographer of Jefferson says: “ And so the debate went “ on day after day. The Susquehanna men triumphed in the “ house, but the senate sent back the bilL with ‘ Susquehanna ’ “ stricken out and ‘Germantown ’ inserted. The house would not “ accept the amendment, and the session ended before a place had “ been agreed upon. The subject being resumed in the spring of “ 1790, it was again productive of heat and recrimination; again “ the south was outvoted, and the Potomac rejected by a small “ majority. Baffled in the house, southern men renewed their “ efforts over Mr. Jefferson’s wine and hickory nuts in Maiden “ Lane. Two sets of members were sour or savage from the loss of a measure upon which they had set their hearts. Southern “ men had lost the capital and northern men assumption. Then “ it was that the original American log-roller (name unrecorded) “ conceived the idea of this bad kind of compromise. The bar‘■‘-gain was this: Two southern members should vote for assump- “ tion, and so carry it, and in return for this concession Hamilton “ agreed to induce a few northern members to change their votes “ on the question of the capital, and so fix it upon the Potomac. “ It was agreed at length that for the next ten years the seat of government should be Philadelphia, and finally near George- “ town. How much trouble would have been saved if some pro“'phetic member had been strong enough to carry a very simple “"amendment to strikeout ten years and insert one hundred. And in that case what an agreeable task would have been devolved “ upon this generation of repealing Germantown and beginning a “ suitable capital at the proper place. To the last of his public “'life Jefferson never ceased to regret the part he had innocently taken in this bargain:” Parton’s Life of Jefferson, 394.
Chief Justice Marshall says, in his Life of "Washington, vol. 2, *441 page 190: “At length a compact respecting the temporary and “ permanent seat of government was entered into between the “ friends of Philadelphia and the Potomac, stipulating that Congress should adjourn to and hold its sessions in Philadelphia for “ ten years, during which time buildings fur the accommodation “ of the government should be erected at some place on the Poto- “ mac, to which the government should remove at the expiration “ of the term. This compact having united the representatives of “ Pennsylvania and Delaware with the friends of the Potomac in “ favor of both the temporary and permanent residence which had “ been agreed on between them, a majority was produced in favor “ of the two situations, and a bill which was brought into the sen- “ ate, in conformity with this previous arrangement, passed both “ houses by small majorities. This act was immediately followed “ by an amendment to the bill, then pending before the senate, for (C funding the debt of the Union. The amendment was similar in “ principle to that which had been unsuccessfully proposed in the “ house of representatives. By its provisions twenty-one millions “ five hundred thousand dollars of the state debts were assumed in “ specified proportions, and it was particularly enacted that no cer- “ tificate should be received from a state creditor which could be “ ascertained to have been issued for any purpose other than com- “ pensations and expenditures for services or supplies towards' the “ prosecution of the late war and the defense of the United States, “ or of some part thereof during the same. When the question “ was taken in the house of representatives on this amendment, “ two members, representing districts on the Potomac, who in all “ the previous stages of the business had voted against the assump- “ tion, declared themselves in its favor, and thus the majority was “ changed.”
Attention is also called to the works of Madison, to the Life of *442 Hamilton, by Lodge, page 123, and a very exhaustive review of this legislation will be found in ScbaiFs History of Maryland, commencing on page 564.
The location finally adopted was the result of a trade by which two of the ‘£ Potomac members ” voted for the assumption of the state debts, in return for which northern members voted for the Potomac location. See Jeffersonis Works, IX, 93. This is mentioned to show that when Congress decided to locate the seat of government upon the Potomac it exercised a positive choice and made the selection as definitely as under the circumstances was required. The Susquehanna, the Delaware, and all other localities, were rejected, and the commissioners had nothing to do but to select the best site within the tract designated. When it is considered that the country was at that time but sparsely settled and little known, the limitation to a tract but five or six times the. size of the district to be taken is small enough. When the heat of the contest is considered, displaying as it did the beginning of that sectional feeling between north and south which has raged so long, and when regard is had to the price which the south paid for the location — the voting for the assumption of state debts which had already been rejected by the south — it is hardly possible to claim that this is a precedent for giving to a board of commissioners an unlimited power of selection. Moreover, there are marked differences in the purpose a.nd scope of these two acts. Congress having chosen the locality, and even specified that the buildings should be on the east bank of the Potomac, provided for the appointment of commissioners by the President to carry out the necessary work of detail; in a word, experts, surveyors who should survey, define, and limit a district of territory within the limits named.” These commissioners were not called upon to decide where within the United States the federal seat of government should be, comparing the advantages of various localities as to *443 accessibility and general fitness, but simply to select within the prescribed territory such a district as was best fitted for the site of public buildings and for the laying out of acity. "When Congress passed that act it practically fixed the location of the capital of the United States.- Had this bill been equally definite it would have confined the location to some county; for illustration, say the county of Beadle, or Davison, or Spink, or to a point on the east bank of the Missouri river, between the mouth of Medicine ereek and Fort Sully, in Dakota; or, perhaps, on the east bank of the Missouri river above the mouth of Apple creelc.
In any of these cases would there have been any doubt but the legislature had exercised its j udgment, had approximately fixed the location of the capital, and not delegated to a commission all the discretion which could be exercised? In every case when a commission has been provided for to select the location of a capital, the legislature, or Congress, as the case may be, has designated its choice so definitely as to exclude all contending points for the location, except one, with the sole exception of the state (not territory) of Illinois, where the mode of selection was definitely fixed in the constitution.
From the whole case I must conclude that the act of the territorial legislature creating the capital commission was unwarranted and invalid, and that the j udgment of the District Court should be affirmed.