# CASES AT LAW

DETERMINED IN THE

# COURT OF ERRORS AND APPEALS

OF THE

## STATE OF NEW JERSEY,

JUNE TERM, 1888.

---

THE STATE, JOSEPH PAUL, v. THE JUDGE OF THE CIRCUIT COURT OF GLOUCESTER COUNTY.

THE STATE, JOHN HART, v. JOHN E. SCOTT, CITY CLERK OF JERSEY CITY ET AL.

1. An act entitled "An act to regulate the sale of intoxicating and brewed liquors," may lawfully interdict the sale of such liquors by the small measure. It is regulation, and not prohibition. The act is not void, within that provision of our state constitution, which says: "To avoid improper influences, which may result from intermixing in one and the same act, such things as have no proper relation to each other, every law shall embrace but one object, and that shall be expressed in the title."
2. The said act prohibits only the sale by the small measure.
3. The classification by population for the purpose of fixing the minimum license fee in the several townships and cities, is a valid classification, and imparts to the law the quality of general legislation.
4. The provision in the law, that if a majority of the legal voters in a county shall vote against the sale of intoxicating and brewed liquors, no license shall be granted within the county for the sale thereof, is not an unlawful delegation of power by the legislature.
5. The law is not in contravention of our constitutional provision, that "the legislature shall not pass private, local or special laws, regulating the

585

internal affairs of towns and counties." This inhibition in the constitution is not intended to secure uniformity in the exercise of delegated police powers, but to forbid the passing of a law vesting in one town or county a power of local government not granted to another.

6. The law, in providing that the circuit judge shall determine whether the circumstances have arisen which require an election, and appoint the day for the election, is not in violation of that part of the constitution which says: "The powers of government shall be divided into three distinct departments—the legislative, executive and judicial; and no person or persons belonging to, or constituting one of these departments, shall exercise any of the powers properly belonging to either of the others, except as herein expressly provided."

7. The notice of application to the judge for the ordering of an election, was published in all the newspapers among which the governor and comptroller must make their selection of those entitled to publish the laws. *Held*, that this was a sufficient publication, although the selection by the governor and comptroller had not then been made.

8. The provision of the general election law, requiring special elections to be held on Tuesday, does not apply to the election to be held under the law in question in this case.

9. The said act is constitutional in respect to its "high license" and "local option" features.

In error.

For the plaintiffs in error, *Leaming & Black, F. W. Stevens, H. C. Pitney* and *Leon Abbett.*

·For the defendants in error, *John A. Blair* and *Samuel H. Grey.*

The opinion of the court was delivered by

VAN SYCKEL, J.    The principal question in these cases is as to the constitutionality of an act passed at the last session of our legislature, entitled "An act to regulate the sale of intoxicating and brewed liquors."

The law consists of two parts.    The first part establishes a minimum license fee for the several townships, towns, boroughs and cities of the state, graduated according to population, and is called the "high license law."

The second part of the law provides for a vote in each county on the application of one-tenth of the legal voters, to deter-

Paul v. Gloucester County.

mine whether or not any intoxicating or brewed liquors shall be sold within the county, and is styled the "local option" law, in the discussion of the case.

The Paul case involves the validity of the local option part of the law ; the Hart case that of the high license feature.

The constitution of this state provides that " to avoid improper influences, which may result from intermixing in one and the same act such things as have no proper relation to each other, every law shall embrace but one object, and that shall be expressed in the title." Upon this part of the fundamental law of the state the first attack upon this legislation is based.

The contention is that the object of the act is not expressed in the title ; that the effect of the act is to prohibit the sale of liquors, and that object is not indicated by the title " an act to regulate."

The case principally relied upon to support this view, is the *Hauck Case*, in the Supreme Court of Michigan, reported in 14 *W. Rep.* 471. The law there provided that when a majority vote in the county was cast against the sale, it should be thereafter unlawful to manufacture, sell, give away or furnish malt or intoxicating liquors of any kind or in any quantity. This case was well decided. The enactment clearly and expressly prohibited the sale of liquors, and that purpose was not manifest in the title. Mr. Justice Dixon, in *State* v. *Fay*, 15 *Vroom* 477, tersely states the true view in this way : " Intrinsically, regulation and prohibition range in different spheres. No sale which is prohibited is regulated, and none regulated is prohibited."

If, therefore, the law under review prohibits the entire traffic in case of an adverse vote, there could be no hesitation in pronouncing it a violation of the constitutional mandate.

The first three sections relate expressly to the sale by small measure. They provide for the license fee and regulate the sale under the license. In our law no provision has been made for requiring license to sell by greater quantity than one quart, unless to be drank upon the premises.

Section 4 authorizes a vote "to determine whether or not any intoxicating or brewed liquor shall be sold within the county."

This language is broad enough to include the entire traffic, but the section forbids nothing—it makes nothing unlawful.

Nor is there anything in sections 5 or 6 which declares any sale to be illegal.

Section 7 expressly states what shall be the effect of the majority vote against selling, in these words: "Whenever it shall appear that a majority of the votes cast in such county are against the sale of intoxicating liquors, no license shall thereafter be granted to any person within the limits of such county to keep an inn or tavern or saloon, or to sell spirituous, vinous, malt or brewed liquors, to be drunk on or about the premises."

This, unquestionably, relates only to sales for which license is required.

If it had been intended by the vote to prohibit the sale generally, the seventh section would have said, in the language of section 4, that no intoxicating or brewed liquors should thereafter be sold. The legislature having thus distinctly stated what the effect of the majority vote shall be, the maxim, "*expressio unius exclusio alterius*," clearly applies.

Other or different effect cannot, by judicial interpretation, be given to the vote, unless some after-language in this statute plainly indicates that such was the intent of the law-maker.

The only remaining section bearing upon this topic is the eighth. It provides that "any person who shall traffic in, sell, expose for sale or give away, with intent to violate any of the provisions of this act, or shall suffer to be trafficked in, sold or exposed for sale or so given away, any liquors mentioned in the seventh section of this act, by whatever name called, shall be deemed guilty of a misdemeanor."

This section is badly drawn, and does not indicate, with clearness, what the purpose of the draftsman was.

The words, "so given away," show that the object in the mind of the framer will be promoted by transposing the words, "with intent to violate any of the provisions of this act," and

reading it in this way : " That any person who shall traffic in, sell, expose for sale or give away, or shall suffer to be trafficked in, sold or exposed for sale or so given away, any liquors mentioned in the seventh section of this act, by whatever name called, with intent to violate any of the provisions of this act, shall be deemed guilty of a misdemeanor."

This construction harmonizes the previous sections of the act, and restricts its bearing to the liquors mentioned in the seventh section, that is to say, to the sale of liquors in such quantities as there must, under our laws, be a license to sell. If total prohibition was intended, it cannot reasonably be conceived that the legislature would have failed to use the simple language necessary to express that purpose, without restricting the prohibition to the liquors mentioned in the seventh section.

Due regard must also be given to the title of the act, in determining the scope which the legislative will has imparted to it.

In *Hendrickson* v. *Jones*, 16 *Vroom* 555, this court held that a statute which made void a power of attorney inserted in the body of a note or bond, did not apply to such a note made in this state for the purpose of entering judgment by confession in Pennsylvania, for the reason that the section containing this provision was in a statute entitled " An act to regulate the practice of law," and could not, therefore, be construed to affect such instruments, when not designed to be used to enter judgments in our own courts.

In *Dobbins* v. *Northampton, ante p.* 496, Mr. Justice Depue said : " The constitutional mandate that the object of every law shall be expressed in its title, has given the title of an act a two-fold effect. It has added additional force to the title as an indication of legislative intent in aid of the construction of a statute couched in language of doubtful import, and it also operates as a constructive limitation upon the enacting part.

The legislature, in the title adopted for this act, has indicated its purpose to restrict it to regulation, and not to extend

it to prohibition of the entire traffic, conceding that there is some doubt as to the extent of the prohibition, will not overthrow the law. The expressed will of the law-maker cannot be set aside by the judiciary, unless it is clear that he has transcended his constitutional prerogative. To be in doubt is to be resolved in favor of the law.

Upon what language in this act could an indictment for selling by larger measure than one quart be maintained? A criminal offence will not be created by doubtful construction; there must be something equivalent to expression to justify the punishing as a crime that which has hitherto been a legitimate business in which hundreds are engaged.

The act before us will certainly bear the construction I have given it, and in a case of doubt that interpretation must be adopted which will uphold the law.

Assuming that the extreme effect of this legislation is to forbid the sale by small measure, in my judgment it must be regarded as a law regulating the sale of intoxicating and brewed liquors. It regulates the sale by prohibiting it in small quantities.

Every license law is, to some extent, a prohibitory law; it prohibits the sale by all persons who have no license.

But it is said that the prohibition is absolute within the sphere in which the law operates; that is, as to the sale by the small measure.

So is the law which absolutely forbids the sale by the small measure on Sunday, or on election day.

So would be a law which prohibited the sale to minors, or within a certain distance from a college. Such laws are, therefore, none the less regulations of the liquor traffic. They operate as a check—as a partial restraint upon the sale, not an absolute inhibition—and are, in the strictest sense, regulation.

The regulation becomes more or less stringent as you increase or diminish the extent to which it operates to prevent sales, but it reaches the point of prohibition and ceases to be

regulation only when it wholly inhibits the traffic. Unless this view is accepted, we cannot stop short of maintaining that every law which prohibits any portion of the traffic, is a prohibitory law. This would give to the word "regulate" no substantial significance. It may be that if this law forbade the sale in less quantity than ten thousand hogsheads, this court would pronounce it null and void, but it would be because the title would be manifestly and intentionally misleading, and would show that the excepted quantity was inserted as a mere subterfuge to evade the constitutional mandate.

The soundness of legal principles cannot be tested by such instances.

The fees for license to sell by the small measure, when granted, and under what circumstances such licenses shall be wholly refused, are kindred subjects, which pertain to the regulation of the liquor traffic, and they may be dealt with in a single act by the legislature. The title sufficiently expresses the object of the act, and no infirmity is found in it.

In dealing with this constitutional limitation, it will always be well to look at the source from which it was derived, which will be found in section 18 of the instructions for Lord Cornbury in 1702, in these words :

"You are also, as much as possible, to observe in the passing of all laws, that whatever may be requisite upon each different matter, be accordingly provided for by a different law, without intermixing in one and the same act such things as have no proper relation to each other; and you are especially to take care that no clause or clauses be inserted in or annexed to any act which shall be foreign to what the title of such respective act imports." *Leaming & Spicer, p.* 623.

This instruction, like the provision in our constitution, and unlike many of the state constitutions, embodies the reason which led to its adoption. Taking that as a guide to interpretation, it must be admitted that it has been applied with sufficient strictness.

The second question to be considered is, whether the classi-

fication by population in the first section of the act for the purpose of fixing the minimum license fee, is vicious.

It is conceded that the section is a regulation of the internal affairs of towns and cities, and that the diversity created by it is fatal to its validity, unless the basis of the classification is a substantial one.

Whether the basis of classification is wise or judicious, or whether it will operate as fairly as some other basis that might be adopted, is a question for the legislature, and not for the courts.    The extreme limit of our inquiry in this direction is, Does population bear any reasonable relation to the subject to which the legislature has applied it; is it germain to the law?

In administering the license laws, the practice has prevailed under the inn and tavern act to regard the density of population in fixing the license fees.    Where the population is dense the legislature may have concluded that the people will be more prosperous; that they will expend their money for luxuries more freely and will pay higher prices than in sparsely settled districts.    Also, that the larger the population the greater will be the expense of maintaining the police department.    No more suitable basis of classification, which the legislature could have selected for itself, has suggested itself during my consideration of this subject.

I regard this branch of the case as entirely settled by the latest declaration of this court.    I refer to *Randolph* v. *Wood*, reported in 20 *Vroom* 85.

The act in that case provides that in cities having a population less than twelve thousand, the term of office of councilmen shall be for as many years as there are members in each ward.

Mr. Justice Knapp, in delivering the opinion of the Supreme Court, said:

"The question is, whether, for the purpose of this legislation, enlarging the terms of office of councilmen, smallness of population may not be a substantial and sufficiently important

ground to distinguish such communities from the great cities of the state.

"May it not be believed that i.i small cities the duties of such office are reasonably small, and that unless the term is for a considerable time, competent men are not likely to be had, and that, in this, large cities differ. If these or other considerations justify the drawing of some line between larger and smaller populations, it is for the legislature to say where the line shall be drawn. I am not prepared to say that the selection of the smaller population as the object to which this legislation shall apply, is so inappropriate that we may deny to the legislation based on it, the quality of a general law."

This case was unanimously affirmed by this court, and the opinion of Justice Knapp, in the Supreme Court, adopted as the opinion of this court. *Randolph* v. *Wood*, 21 *Vroom* 175.

The questions which have been discussed in reference to the mode of trial and the penalty prescribed for the violation of this law, are not necessarily involved in either of the cases before us. It is sufficient to say that the provisions in this regard may be eliminated from the act without destroying its validity.

The remaining questions to be discussed concern the "local option" branch of the law.

In approaching this subject it is pertinent to remark, that there is no express provision in our constitution that legislative power shall not be delegated.

The assumed incapacity to delegate is implied, as a necessary result, from the fact that, in our system of government, the power to make the laws is lodged in our senate and general assembly; that a consequent obligation rests upon them to exercise the function with which they are entrusted; and that in the absence of express authority to delegate, such authority does not exist.

The only restraints upon the exercise of the legislative prerogative are those expressly or impliedly contained in the federal and state constitutions, and those immutable principles which lie at the very foundation of society.

When we recur to the fact that the power of eminent domain has been delegated to railroad and other corporations without challenge ; that the important power of taxation and all the powers of local government have, for more than three generations, been delegated in our state, we are admonished not to be too confident in asserting where the precise limitation is upon the competency of the legislature to delegate powers of government.

We must be careful, therefore, how, in the absence of express injunction or clear implication, we strip a co-ordinate branch of the state government of the right to give expression to its will, in the form of law, within its own department.

At a very early day the federal court upheld a law which was framed to take effect upon a contingency as to the conduct of foreign governments. I refer to the "non-intercourse" law, which, in effect, provided that in case Great Britain or France should revoke or modify its edicts previously issued, so that they should cease to violate the neutral commerce of the United States, the trade suspended by law should be renewed. *The Aurora* v. *United States, 7 Cranch* 382.

In the numerous judicial discussions of laws for the control or suppression of the liquor traffic, the subject of contingent legislation has been widely debated, and many adjudications have been made to turn upon the views of judges as to the character of the contingency.

The following cases will give reference to many others, and present the conflicting views of such legislation. *Ex parte Wall*, 48 *Cal.* 279 ; *Barto* v. *Himrod*, 8 *N. Y.* 483 ; *Rice* v. *Foster*, 4 *Harr.* (*Del.*) 479; *Locke's Appeal*, 72 *Penna. St.* 491; *Smith* v. *Janesville*, 20 *Wis.* 291 ; *Waggard* v. *Pond*, 12 *Wes. Rep.* 368.

I do not propose to enter upon a criticism of these cases in this aspect, nor to attempt to support the legislation before us upon the theory that it is valid as contingent legislation.

The judgment of this court can be rested upon what I conceive to be solid ground, aside from the consideration of the

circumstances under which laws may be made to depend on a contingency.

Three propositions will be assumed, which cannot be successfully controverted without subverting legislation which has stood unchallenged for more than a century.

1. That the mode prescribed by the inn and tavern act for granting license, is valid.

2. That the legislature has a right to grant to municipal corporations the power to regulate and prohibit the sale of liquors.

3. That the legislature has power to pass a prohibitory law.

These premises have not been denied by any of the counsel who appeared against the law, and were expressly conceded by some of them.

With these concessions, it seems to me that the conclusion is inevitable, that there is no unlawful delegation of legislative power in this case.

This part of the case can safely be rested upon either of two grounds.

*First.* The sale of intoxicating liquor has, from the earliest history of our state, been dealt with by legislation in an exceptional way. It is a subject by itself, to the treatment of which all the analogies of the law, appropriate to other topics, cannot be applied.

And, at the outset, it is of the first importance to observe that the statement that the vote authorized by this law, if against the sale, prohibits the sale, or that it makes this law, in effect, prohibitory of the sale by small measure, is inaccurate and erroneous. If the vote is in favor of the sale, that does not authorize the sale, and no more does the adverse vote prohibit it.

The refusal to license does not prohibit the sale by any one; its only effect is, that by such refusal no one is enabled to sell in contravention of the law, which prohibits all. If license be granted to some, still all not having such license are within the interdiction. The prohibition, therefore, is not dependent on the vote; it arises out of the law, and not out of the vote.

The question whether license shall be granted, is all that is involved in the vote, and that question, I will endeavor to show, has always been committed to the judgment of a tribunal selected by the legislature.

For brevity, I will term the law before us the " new law," and the previously existing law the " old law." The old law, which remains unrepealed, absolutely forbids the sale by small measure.

This inhibition can be escaped only by obtaining license. No one has a right to demand a license; license is a special privilege granted to the few, denied to the many. We will probably, therefore, be led into error, if we reason upon this subject, as we may in respect to those pursuits which are open to all upon the mere payment of a license fee.

The license by the old law cannot be granted unless twelve reputable freeholders certify that it is necessary and will conduce to the public good.

The necessity for a recommendation appears in the license law as early as 1738. *Nevill's L.*, *p.* 239 ; *Allinson's L.*, *p.* 102.

The act of 1797 (*Pat. L.*, *p.* 235), required " the chosen freeholders, the commissioners of appeal and the overseers of the poor, or at least two-thirds of them," to recommend the application for license.

What, then, is the precise enactment in the old law ? It is simply this—nothing more, nothing less—viz., that license may be granted if " it is necessary, and will conduce to the public good." *Rev., Inn and Tavern act,* § 3.

The legislature has never decided for itself whether the granting of license will be for the public good.

It has adopted the various modes I have referred to for determining that question, and made the granting of license to depend upon the finding of a tribunal other than itself.

The inn and tavern act is none the less a valid law, because the legislature did not decide for itself, whether the public good required license, or because it refers that question to others.

The legislature did, by the law, determine that liquor shall not be sold by the small measure, and that no license shall be granted unless the public good requires it. That has always been regarded as a complete law. If the old law, requiring twelve men to certify that license will conduce to the public good, is valid, will it not be equally competent for the legislature to provide that no license shall be granted, when twelve men certify that it will conduce to the public detriment and injury? If not, why not?

If such were the law, would the law be uncertain, or would its integrity, as a law, depend on the action of twelve men?

Would it be a delegation to the twelve men of the power to make the law?

In the *Wall Case*, 48 *Cal.* 279, Judge McKinstry, in commenting on the New Jersey case, 7 *Vroom* 72, says : " It is plain in such case that the law-makers do not intend to establish the new rule until it shall have other sanction and allowance than that of the legislature itself. Licenses were granted by authority of the old law ; they can be prohibited only by a new law. But, in the case supposed, the legislature does not determine that licenses shall not be granted, but leaves it to the popular vote to determine the very contingency which the legislature must determine for themselves, in order to give effect to the law."

This reasoning, if accepted and logically applied, will overthrow our old license law, and make the legislature incompetent to enact a law that no license shall be granted, when twelve men certify that it will conduce to the public injury.

Does the legislature, under the old law, in the language of the learned judge, determine, in the particular case, that license shall or shall not be granted? Does not the old law leave it to the twelve men to determine what he says the legislature must determine for themselves, in order to give effect to the law?

The only difference between the old and new law is the extent to which they operate.

Nothing is left by the new law to the voters, which is not

left by the old law to the certifiers. Assuming that the old law is valid, let us examine whether the new law creates, in substance and principle, any different state of affairs, so far as relates to the question of constitutionality.

The law still says that the sale by the small measure shall be absolutely prohibited.

The law still, in substance and effect, is that license shall be granted as heretofore, if the public good requires it.

It must be assumed that the legislature supposed that the people would vote for what they deemed to be the public good, and instead of being content with the certificate of twelve men, the legislature deemed it prudent and judicious that those to whom the issuing of license is entrusted, shall be informed by a majority vote of the people of the county, whether it will conduce to the public good to grant the license.

If the new law had provided that every voter should say, upon his ballot, whether, in his opinion, it will conduce to the public good to grant license, would it be any clearer that the legislature intended to make the granting of license to depend upon the question, whether it is for the public good.

What, then, is the distinction between the old law and the new law, in this respect?

In neither does the legislature decide the question for itself; in both cases it commits this question to others.

If the legislature may refer the question of the propriety of granting license, in the one case, to a small number of the people to be affected by it, why may it not, in the other case, refer it to a larger number?

What limitation is there upon the number to whom it shall be referred?

What difference is there in principle, whether the opinion of those to whom the reference is made, is communicated by means of a petition, or a remonstrance, or a majority ballot?

But it is said that in this case, under the adverse vote, there is a refusal of all license, while, in the other case, it is a question, how many licenses shall be granted? Concede it, but as

the legislature may absolutely prohibit license, or repeal the license laws, what difference is there in principle ?

If the legislature may refer to another tribunal the question, whether it is wise to grant license to some persons and not to others, what obstacle is there to the reference to a like tribunal to determine whether it is wise to grant license in any case ? There cannot be any difference in principle, conceding, as we must, that the legislature may lawfully prohibit all license.

The difference in the effect of these laws, that one prevents some licenses, and the other prevents more or all licenses, is altogether too slender and unsubstantial a distinction to justify judicial interference with legislative action.

In my opinion, the law is a complete law in itself; as complete, at least, as the old law in this particular.

It is unchanged by the vote of the people. Before the vote, the sale by retail is prohibited. After the vote, it is still prohibited.

Before the vote, it authorizes license, when it is indicated by a majority vote, that it is for the public good.

After the vote the law is the same.

The granting of the license, as under the old law, is exercised only when the tribunal selected by the law-maker decides upon the expediency of doing so. The right of the legislature to refer that question in the one case, must involve the right to refer it in the other.

And here it may not be inappropriate to call the attention of those expounders of the constitution who so confidently set up their theories and assertions to overthrow laws of this character, to an act of congress, passed March 3d, 1887. *U. S. Stat.*, 1886–7, *p.* 475.

It is an act authorizing the president, when he is satisfied, that certain acts of hostility have been committed against our fishermen, not only to put in force certain provisions in said act contained against the adversary, but also authorizes him, in his discretion, to qualify and limit the application of the provisions of the act, and makes the violation of the presi-

dent's proclamation a misdemeanor, punishable by fine and imprisonment.

I do not commit myself to the competency of this federal legislation in its entire scope, but refer to it to show how a body of men containing lawyers of eminent ability, familiar with constitutional principles, have exercised the legislative prerogative.

*Second.* The validity of this law may be rested securely upon the right of the legislature to delegate the powers of local government to political subdivisions of the state.

The capacity to grant such legislative powers, commonly called police powers, to municipal corporations, is admitted.

The distinction is suggested, that the by-laws and ordinances of local governments have not the force or effect of laws; that they must be reasonable, and are subject to be set aside on *certiorari* by the courts.

To this I cannot assent. The rule, in this respect, is correctly and accurately stated by Mr. Justice Depue, in this way: " A grant of power to a municipal corporation to legislate by ordinance on enumerated subjects connected with its municipal affairs, is in addition to the power of making by-laws, which is incidental to the creating a corporation." *State, Taintor,* v. *Morristown,* 4 *Vroom* 57. " The court will inquire into the reasonableness of ordinances passed by a municipal body under legislative authority, when the powers granted are expressed in terms which are general and indefinite. But when the legislature has defined the delegated powers and prescribed, with precision, the penalties that may be imposed, an ordinance within the delegated limit cannot be set aside as unreasonable." *Haynes* v. *Cape May,* 21 *Vroom* 55.

Again, it is said that the right of the legislature to delegate police powers has its origin in the common law of England, under which the king, by his royal charter, erected the municipalities, and that such delegation can now be made by the legislature only to the extent sanctioned by settled usage at the time our state constitution was adopted.

No argument can safely be founded upon the conditions

which, in this respect, existed at common law. At the time of the adoption of the constitution, the people of New Jersey were sovereigns. All the powers which had resided in the king of Great Britain passed to them, with the absolute right to govern themselves. When, in the exercise of their sovereignty, they adopted a written constitution, distributing the powers of government, the right to legislate, in its entire scope, passed to the legislative bodies which the people erected. No legislative capacity was reserved to the people themselves, and no provision was made that any part of the legislative function might be delegated.

We must look for the origin of the right to delegate these legislative powers, not in the name of the political district, nor in the condition of the people to which they were committed. That might have created a necessity for the delegation, but could not have conferred upon the law-maker the right to make it. Its true foundation is in the fact that it must have been deemed, in general acceptance, the exercise of one of the legitimate functions of legislation to grant these powers to political subdivisions of the state at the will of the legislature.

There is no more right inherent in a city than in a county to have these powers bestowed upon it. If there is, then the legislature, having absolute power to create a city co-extensive with county lines, can, by its own act, enlarge its powers under the constitution.

The mistake is in assuming that the legislative capacity is dependent upon, and inseparable from, the character of a political subdivision of territory, which it can, at will, create or extinguish. The power of the legislature springs solely from the character of the grant.

But it is said that if the legislature may grant this power to counties, all legislative function may be referred back to the people.

The limitation upon legislative power is in the subject itself, and not in the nature or character of the political subdivision of the state to which the grant is made.

Can the right to declare what the law of attachment shall be, or how the action of ejectment shall be conducted, or what the law of descent shall be, be committed to a city any more than to a county?

Hitherto the right to delegate has been restricted to such powers, in the nature of police powers, as are necessary to local government, among which the control. of the liquor traffic is included.

The legislature is omnipotent to grant these powers to political divisions of the state, now existing or to be created by it. Again, it is said that counties are not in a condition to receive such powers. Why not?

What condition is necessary, in this case, except the legislative will, to give the power and the machinery necessary to the execution of it by the county?

Those portions of our territory which have been erected by legislation into townships and cities, did not become susceptible of accepting such grants by anything which inhered in them as mere parts of the state's domain before any powers were bestowed. From time to time the legislature gave them such powers as it elected.

It was competent to grant one power and to withhold all others, or to grant any number, and, after granting, to revoke them. Subdivisions of the state may now be created and endowed with capacity for self-government simply by act of the legislature, providing that any portion of territory it may select shall exercise one or more such powers. It is essential only that legislation be general as to powers granted. Where is the restraint as to the territory over which the legislative power shall extend? If the legislature deemed it expedient to secure uniformity, could it not give to every county in this state the right to regulate the liquor traffic, or the police department, or the sanitary laws for the whole county, and withdraw those powers from the political subdivisions of the county?

What hinders, since it must be admitted that the legisla-

ture may make the city and the county lines co-extensive and co-incident?

The power of the legislature, under the constitution, cannot depend on the capacity of a political division of the state to receive the authority in question, since that capacity can be given to it at the will of the legislature. A constitutional limitation upon the power of the legislature cannot arise out of a condition which the legislature itself may remove.

As well might we assert that the power that arrests a ball in its falling through the air, proceeds from the ball itself.

The bestowal of powers upon a county which had no means of executing them might prove an abortive measure, but it would not be unconstitutional. The granted powers would lie dormant until further legislation enabled the county to use them.

I am unwilling to adopt a view so narrow.

The extent of the legislative prerogative cannot be dependent upon the names which the legislature itself gives to localities, nor is it of such a nature that it can be increased, or decreased, added to or diminished, by the legislature itself. The power of the legislature must, at all times, be the same.

To assert that the legislative power does not exist and cannot be exercised before the county is erected by legislation into a city, but that it may be exercised afterwards, is constitution-making, and not interpretation of the constitution.

I am unable to find anything in the fundamental law, or in reason, which forbids the law-maker to bestow upon the people of the county the right to exercise all powers of local government within the county limits, to the exclusion of all other political bodies, and without changing the name from county to city. Hence, if all police powers may be granted or delegated to the county, some may be granted and others withheld; the greater includes the less.

The extent to which the delegation shall be made lies wholly within the legislative discretion.

The true basis of the legislative right to delegate these powers, is, as I have said, in the fact that it has always been

recognized as a legitimate part of the legislative function, as well as a duty in harmony with the spirit of our institutions, to enable the people, in whom all power ultimately resides, to control the police powers in communities for themselves.

The expression of the legislative will in due form, that the power shall be conferred, is, in itself, a law. The legislature itself must grant the power, and it cannot disable itself of the right to revoke it. It cannot delegate to the voters of Mercer county the power to determine whether the city of Newark, or the city of Trenton, shall be endowed with the capacity to govern its people. That question must be committed to the district within which the law is to operate.

In *Paterson* v. *Society*, 4 *Zab*. 385, 395, this distinction is clearly presented by Chief Justice Green. He there says : " Had the question been submitted to the people of the state, or of the county of Passaic, whether it was expedient for the legislature to grant a city charter to the township of Paterson, and the operation of the law had been made to depend on that election, the constitutional difficulty would have been fairly presented."

Instances are not wanting in which powers of this character have been delegated to the counties and townships. Examples of the latter are so numerous that it is not necessary to particularize. As early as February 28th, 1714, an act was passed " authorizing the election of two freeholders in every town, and providing that the freeholders so chosen and the justices of the peace should meet and constitute the governing board of the county." *Allinson's L.*, *p.* 14.

The act of 1743 (*Allinson's L.*, *p.* 128), gives power to the chosen freeholders of any county, in conjunction with three justices of the peace, to order the raising of money to build jails and bridges. The board of freeholders of the county has long been an incorporated body, exercising these and other like powers without the intervention of the justices.

The general road board act provides that on application of twenty-five freeholders and tax-payers to the board of chosen freeholders of the county, such board shall, if they deem it

proper, cause it to be submitted to the vote of the legal voters of the county, whether a road board shall be established.

The acts establishing county boards of health are further examples of similar law-making.

All the powers exercised by the counties are of a governmental character.

But why multiply instances of like legislation ?

The delegation of the liquor traffic, to be controlled and regulated by the constituted authorities, for and within the limits of the entire county, has all the sanction of venerable usage.

So far as usage goes, the argument as between townships and counties, is in favor of the latter.

Among the earliest laws in our state are those committing the subject of license in each county to the county courts, to be dealt with on the recommendation of specified persons, and very soon afterwards requiring the certificate of twelve freeholders.

When these laws were first promulgated, and for a long period thereafter, the judges of the Court of Common Pleas consisted of the justices of the peace of the county. They were appointed under the old constitution by the legislature in joint meeting, but they acted in their official capacity for the people of the county. The argument is just as strong as if they had been elected by the popular vote, as they now are. The duty these judges were charged with was a duty for the people of the county, which did not, in this regard, require the performance of a judicial act.

It might, with equal propriety, have been committed to the board of chosen freeholders, or to any other board created by the legislature. It may now be entrusted to such a board. In our municipalities it is commonly referred to the city council or to an excise board.

The extent to which this subject was committed to the county, is wholly immaterial to this branch of the case. The controlling point is, that, in effect, the power was delegated to the people of the county, to be exercised by them and for

them, through those acting for them. Until a recent date, all the general laws of the state have regulated this subject by counties, and not by cities or townships. Although I deem the county to be a public corporation, it is immaterial to show that it is so in the strict sense. It is enough that it is capable of exercising the grant of power, or if without the means of doing so, that the requisite means to that end shall be coupled with the grant. It is quite too late, therefore, to draw a line on this idea, which cannot be overstepped by the law-giver.

An examination of the authorities, and the careful reflection which a subject of such importance merits, have led me to the conclusions which I have announced. The following are some of the cases in accord with the views I have expressed: *Groesch* v. *State*, 42 *Ind.* 557; *Dalby* v. *Wolf*, 14 *Iowa* 228; *Fell* v. *State*, 42 *Md.* 71; *State* v. *Wilcox*, 42 *Conn.* 364; *Commonwealth* v. *Bennett*, 108 *Mass.* 27; *Commonwealth* v. *Dean*, 110 *Mass.* 357; *State* v. *Cooke*, 24 *Minn.* 247.

Other cases will be found by reference to those before cited. They are too numerous to be analyzed and discussed within the reasonable limits of an opinion of this court. They present the views of judges of ability, on either side of the questions involved in this controversy, and they cannot be reconciled.

This court concurs in the views expressed by our own Supreme Court, in *State* v. *Morris Common Pleas*, 7 *Vroom* 72, which has stood for years unquestioned as the law of the state.

At every step of this discussion we are confronted with the rule, which has become axiomatic, that when we are in doubt as to the constitutionality of a law, we must resolve the doubt in favor of its validity.

With the long array of adjudications by learned judges upon both sides of the questions involved, and the forcible presentation of the diverse views of the able counsel engaged in the argument of this cause, we may well be left in doubt, and be led to pause before we interpose the arm of the court to overthrow the action of the legislature.

Whether it is admissible to delegate control of the liquor traffic to all the people of the state in one body, is, obviously,

Paul v. Gloucester County.

a different question.   When we speak of the powers of local government, it seems to be necessarily implied that they are powers committed to subdivisions of the state.

Local government signifies government by the several parts of the state, each part for itself.   Under the constitution, counties are indestructible.

The question remains to be considered, whether this legislation is special and local, and, therefore, in contravention of the constitutional provision, that "the legislature shall not pass private, local or special laws, regulating the internal affairs of towns and counties."

The argument is that this law produces different results in different counties, dependent upon the vote for or against the sale of liquors, and that thus the legislature, by the indirect mode of submitting this matter to the popular vote, accomplishes what it could not do by direct legislation, viz.: it makes the law in one county to differ from that in another.

This is the same argument hereinbefore considered, presented in another form, against the validity of this law, viz.: that this is not a law; that the legislature did not make the law; that the vote makes the law, and that the law varies with the vote.   This error underlies this entire argument.   It assumes what I have denied, that the law is not complete in itself.

If a complete law when it left the hands of the legislature, it is general.   It is the same law for all, and equally within the grasp of the people of each and every county to apply and enforce it at will.

But I will not content myself with this answer.

In establishing legal principles, and especially in expounding constitutional law, we must look at the results which will flow from the views we adopt.   That is a legitimate and universally accepted line of argument.

The grounds relied on to prove that the legislature has transcended its power in this instance, will equally denounce as void the law providing for county road boards, the act enabling city councils to establish excise boards, the Martin act, and others of the same general character.   The latter act

becomes applicable only by its adoption by the common council of any city, or upon petition of a specified number of taxpayers.

These laws, it is true, have not passed the test of judicial scrutiny, and it may therefore be said that they are of doubtful constitutionality, and that one doubtful law cannot be relied upon as a safe prop to the validity of another law of the like character.

Let us recognize the force of this answer.

I shall not argue that several doubts make a certainty.

In my judgment, it is not difficult to demonstrate the fallacy of this argument, that this is a special law.    Let us see.

The argument is, that under this law the effect will be to prohibit license in Mercer county if the vote is adverse, and to allow license in Essex county if the vote is favorable; that an express act of the legislature that there shall be license in Mercer and shall not in Essex, would be a special law, and, therefore, this law, which has the same effect, must likewise be special.

This reasoning will render absolutely void any law, general in form, which the most astute mind can draw, authorizing every municipal government in the state to regulate and prohibit the sale of intoxicating liquors.

Under such a law the city of Trenton might prohibit license, while the city of Newark would leave the traffic practically unrestrained.    In applying such a law, the greatest diversity might exist in different localities.    Such, in fact, is the present condition under existing municipal laws.

The legislature could not lawfully enact, that license shall be prohibited in the city of Trenton, and shall not be prohibited in the city of Newark, and, therefore, the law granting to municipal governments the power of control over this subject is void.

That cannot be done by indirection which cannot be done by direct enactment.

The error lies in charging to the law the diversity which is attributable only to the different modes in which the various

Paul v. Gloucester County.

communities elect to govern themselves under the delegated powers.

These laws authorizing the people to govern themselves are enabling acts—acts which enable localities to govern themselves according to their own will. If diversity in the mode in which they govern themselves under such laws condemns the law as special, then it is manifest that it is incompetent for the legislature to delegate, by general law, the powers of local government.

The delegation of this police power necessarily implies the right to each political district to regulate it in its own way, or to prohibit it. If the law must be absolute, unconditional and peremptory—if it must hold all to a like use of it—it is not a delegation of any authority.

The very object of delegating these powers is to enable the local governments to make such diverse laws as they may deem expedient. Otherwise, the delegation is abortive.

The inhibition in the constitution is not intended to secure uniformity in the exercise of delegated police powers, but to forbid the passing of a law vesting in one town or county a power of local government not granted to another. If one town or county was excepted from the operation of this law, it would be special and local. Under it, one county or town has neither greater or less power than every other, nor does such power differ in any respect.

The authority granted is, in every aspect of it, the same; it may be exercised in a different way or the same way.

An argument so totally destructive of the power to legislate in any form for the political subdivisions of the state, must be rejected as an utter fallacy.

The law, in my judgment, is unquestionably a general law.

The quality of uniformity in result cannot co-exist with the right of self-government in various sections of the state.

The constitutionality of that part of the statute which relates to the ordering of an election, is also assailed in two particulars.

One particular is presented in an argument, thus: The law

enacts that, under certain circumstances, an election shall be held; that a circuit judge shall determine whether these circumstances have arisen; that this determination will be a judicial act; and that the interposition of this judicial " act between the passage of the law and its execution, renders it unconstitutional; that if judicial action is necessary to establish some point, before it can be executed, then the act is unconstitutional."

I am unable to see any force in this argument. The test of constitutionality thus contended for seems to exclude every criminal statute; or, to take more similar instances, it would exclude statutes which provided that on forfeiture of his office by any officer, a special election should be held to choose his successor, or, if in a contested election case, it should be determined that no person was duly elected, a new election should be ordered. Yet I think it has never been surmised that there was any unconstitutional feature in these legal conditions. Such laws are valid.

The other particular is, that for the judge to order an election and set the day on which it shall be held, violates article III. of the constitution, which says: " The powers of government shall be divided into three distinct departments—the legislative, executive and judicial; and no person or persons belonging to or constituting one of these departments, shall exercise any of the powers properly belonging to either of the others, except as herein expressly provided."

One counsel insists that " the naming of the day is an act of legislation ;" another, that the ordering of an election is " a power properly belonging to the legislative and executive departments of the government."

The inability of counsel to agree upon the proper classification of this power, indicates the weakness of the argument. They both disregard the fact that there are many powers of government, speaking generally, which do not, in a constitutional sense, properly belong to either of the departments mentioned.

This constitutional clause relates only to those powers which,

Paul v. Gloucester County.

by the constitution itself, are assigned to, or which, in their nature, pertain to one of these departments exclusively. Thus, I presume, the chancellor could not be authorized to act as governor, in case of the death of the governor, the president of the senate and the speaker of the house of assembly; and the senator of each county could not be authorized to hold the Circuit Court during the recess of the legislature.

But there is a multitude of governmental duties which have never been and cannot possibly be performed, either by the legislature or by the governor, and which are certainly not prescribed by the constitution to the judiciary. Yet the constitution vests all the legislative power, of which it here speaks, in the senate and general assembly, all the executive power in the governor, and all the judicial power in the courts.

The conclusion is inevitable that this multitude of duties was regarded as lying outside of what were termed the powers properly belonging to the executive, legislative and judicial departments, and was left by the constitution to be discharged in such mode as the law should provide.

For instance: Contracts may be and are made on behalf of the state by the legislature, the executive or the judicial department. Each of these departments appoints the incumbents of statutory offices. The governor and chief justice act together on various commissions; and, in divers other respects, one department exercises authority which might as well have been devolved by statute upon another.

There is no reason for denying that the mere ordering of a special election, when the conditions exist which legally require it, and the setting a day for holding it, are included in this large class of acts which may be performed indifferently by any department to which legislative discretion may assign them.

Ever since the present constitution was adopted, the power to order a special election to fill vacancies in the legislature, and fix a day therefor, has been lodged, without question, in the house where the vacancy existed, or in the governor, according to circumstances.

If this power "properly belonged," by the constitution, to either, the other could not exercise it.

A similar power, with regard to a vacancy in the office of sheriff, was, for many years, reposed in the Common Pleas. *Nix. Dig., tit. "Sheriffs,"* §§ 10, 33.

In this respect the act is valid.

The remaining objections relate to the mode in which the act has been pursued.

First, that the judge ordering the election failed to have notice of the application to him published in each newspaper in the county entitled to publish the laws, as the statute requires, the contention of counsel being that no newspapers become entitled to publish the laws until they are designated for that purpose by the governor and comptroller, and that no designation has yet been made. It is a sufficient answer to this to note that the judge's order recites that the notice had been published in all the newspapers entitled to publish the laws in the county; that the Supreme Court has affirmed this order, and that there is nothing before us to show that the adjudication of fact contained in this affirmance was erroneous in law.

But, besides this, the publication in all the newspapers, among which the governor and comptroller must make their selection, is a compliance with the statute.

The second objection is, that the judge ordered the election to be held on Wednesday, while the general act to regulate elections requires all special elections to be held on Tuesday. *Rev., p.* 362, § 139.

We think the statute under review does not adopt this clause of the election law. Those provisions of that act which regulate the manner of holding the election, which prescribe the duties and compensation of the election officers, and the penalties of misconduct, are expressly adopted for the purposes of the election to be held under this statute, but the day is to be fixed by the judge himself, without any other limitation than that it shall not be within sixty days of any general election

in the county, nor less than three months, nor more than six months, from the date of the order.

No infirmity being found in the legislative act, so far as it relates to these cases, nor in the proceedings below, the judgment of the Supreme Court, in both cases, should be affirmed.

REED, J. (dissenting). I assume, as my first proposition, that the legislature, to whose judgment, wisdom and patriotism, the high prerogative of legislation has been entrusted by the constitution, cannot relieve itself of the responsibility by choosing other agencies upon which the power shall be devolved, nor can it substitute the judgment, wisdom or patriotism of any other body for those to which alone the people have seen fit to confide this sovereign trust. *Cooley on Const. Lim.* 116.

This principle has become so firmly intrenched in the jurisprudence of this country, and has been so authoritatively recognized by the courts of this state, that discussion of it would be profitless. *City of Paterson* v. *Society*, 4 *Zab.* 385 ; *State, Gaines, pros.*, v. *Hudson County Com.*, 8 *Vroom* 12.

My next proposition is, that the submission to the people of the state of the question, whether a statute framed by the legislature shall be operative or inoperative, is a delegation of legislative power. This seems to me so obvious that had not some learned judges announced a contrary view, I should not think it a question open for discussion.

One of the processes of reasoning by which these judges reach this result is based upon what I shall hereafter, for brevity, style the contingency theory. It is admitted, say they, that a statute may be passed to take effect upon a contingency, therefore the contingency may as well be a popular vote of approval or disapproval of the legislation as any other uncertain future event.

Now, it is, of course, entirely settled that the legislature can pass an act to take effect upon the occurrence of a future event—upon an anticipated condition of affairs to arise in the future. The prevision of the legislature is constantly called into action

to meet a condition of facts which may arise in the future.
Congress passes an act concerning the revenue, which shall be
dependent for its operation upon what some other nation does
in regard to the same matter.   A state legislature passes an
act that counties may subscribe for railroad stock whenever
two-thirds of said stock has been taken by private subscrip-
tion, or to donate $15,000 to a monument fund, whenever the
same sum has been raised by private subscription.  These are all
legitimate contingencies, because they involve no conflict with
any organic law.   But a statute which, by its terms, becomes
operative upon a contingency which would result in a lottery,
would be palpably void; and, for the same reason, a statute,
to take effect upon a contingency that left the very existence
of the law dependent upon the volition of some person or per-
sons other than the legislature, so as to involve a delegation
of the law-making function, encounters an implied constitu-
tional principle, and, for that reason, is void.   The argu-
ment, therefore, that because an act of the legislature may be
framed to meet a contingent state of affairs, therefore all acts
designed to take effect upon a contingent event are good, is
not tenable.   If the contingency runs counter to a rule of
public policy or of constitutional prohibition, it must give
way to the higher law.   The difference between statutes based
upon a valid contingency and those based upon a contingency
void as a delegation of legislative power, may, I think, be
clearly stated.   The first is a statute ordaining a fixed rule of
civil conduct applying to a certain prescribed condition of fact
which may arise *in futuro*.   The last is a statute which leaves
to the people the power to say whether, when such a rule has
been enacted, it shall ever become operative.   One leaves the
rule a law ready to operate upon the subject whenever it
arises.   The other leaves it to another will to say whether the
rule shall ever be a law.   Now, take any of the instances of
legislation dependent upon a contingency, which has received
judicial sanction, and I am confident that it can be placed in
the former class.   The case of the *Aurora* v. *United States*, 7
*Cranch* 382, is a stock case of those who hold the contingency

theory.  Congress had passed a law forbidding importations by England and France.  One of the sections provided that the president, in case either England or France should revoke their edicts, should declare the same by proclamation, after which trade might be renewed.  The operative force of this act is said to depend upon the will of the president.  But it does not.  It depends upon a future condition of affairs, namely, whether either England or France, or both, do or do not permit us to trade with them.  The proclamation of the president is only a notice of such change of condition, upon the existence of which alone the law depended.  If the operation of the law had been left to the absolute discretion of the president, it would have been a delegation of the legislative power.

Judge Cooley has intimated another ground upon which he thought it might be possible to justify such a delegation of legislative function.  It is this : That the submission of a statute to the people for their approval or disapproval, is but a reference of the law-making power back to the source of all legislation.  The suggestion is, that as the legislature is the creature of the people, and is one of the agencies by which the people carry on representative government, therefore a submission of the propriety of a certain legislative policy is but the reference back to the principal by the agent.

If there is force in this contention, it is perceived at once that it can only be true when the submission is made to the entire people of the state.  It is the people of the state at large who adopt the organic law of the state, and a reference back to a portion of the people of the state is not a submission to the original source of legislative power.

But, indeed, there is no analogy between the relation of principal and agent, and the relation which the public bears toward the legislature.  The people, when they devolved upon the legislature the legislative branch of the government, stripped themselves of this power so long as the constitution stands.  The people could have retained the character of a pure republic, in which the people enacted all rules of civil conduct.  But, instead, they adopted a system of representa-

tive government for the very purpose of avoiding the difficulties which would result if legislation was left to the spasmodic, hasty and often inconsiderate action of an unwieldly body, too large for deliberation and too liable to transitory gusts of passion and prejudice for wise and sober legislative work. This is manifest from the character of the scheme which was adopted. It was deemed well enough to have in the legislature those who represented the present sentiment of each locality of the state. So the house of assembly was composed of a large membership elected annually. Then the senate was organized, smaller in membership, and with terms long enough to ride the waves of popular feeling, and to view public questions from a different standpoint. And, again, the veto power was confided to the executive for the purpose of compelling more deliberation and thought in the framing of statutes.

Our government, like all of the state governments, was modeled after the national legislature, and the object of the required concurrence of these three diversely constituted bodies in that scheme of legislation is apparent from the debates when this most important feature was before the federal convention of 1787.

· After the adoption of this well-matured scheme, it seems absurd to say that the very power which, by the words of the constitution, is vested in the senate and general assembly, can be exercised by any other body. And it seems equally absurd to say that, so long as the constitution exists in its present form, the legislature can consent to its exercise in other than the constitutional method. For it seems clear that a withdrawal of legislative power, even by the consent of that branch of the government, and its resumption by the people, is, *pro tanto*, a suspension of the constitution, and this can be done only by a new convention or in the manner prescribed by the constitution itself. Indeed, I am unable to perceive, if this constitutional provision can be disregarded because the law is adopted by the people who adopted the constitution, why any law cannot, by the same method, be passed, regardless of any constitutional restriction. *Ex post facto* laws, laws

creating lotteries or granting divorces, by submission to the people, would, by the same line of reasoning, become valid enactments, because the people who framed the constitution had afterwards approved the law, and so withdrawn the delegation of power from that body, which alone is bound by the provisions of the constitution.

Another view, however, upon which some judges have recognized the validity of laws referred to the people for approval or disapproval, is an outgrowth of the contingency theory. It is that the law is perfect when it comes from the hands of the legislature, and derives its force from the enactment of the legislature and not from the vote of the people; that the vote is the result of the law, and not the law of the vote. I cannot see any plausibility in this notion, although it has been dressed in the subtlest phraseology. It is said that it is a perfect law when it comes from the hands of the legislature. By this it is meant that the law has the signature of the speaker of the house and of the president of the senate, and, perhaps, of the governor. In this sense it is perfect. So is any statute which contravenes a constitutional prohibition, or a fundamental rule of public policy, and, for that reason, is absolutely void. If this statute, as I have already remarked, delegates to the people the power to do that which is legislation, then it does not matter how perfect its form, it is void. An act of this kind does leave to the people the final word upon the question of law or no law. The assertion that the vote is the result of the law, and not the law of the vote, is only a half truth. The vote is the result of the law, and the law is the result of the vote. Unless a scheme framed by the legislature had provided for a vote, of course there would be no vote; so the vote grows out of the statute. But because the vote is, in this sense, a part of the scheme of legislation, it is no less true that all the people, as a legislative body in the last resort, is entrusted with the determination of the final question, law or no law. It adds to those bodies to which the constitution confides the approval of the law, another body. It makes the vitality of the frame-work which the legislature has drafted,

to depend upon a mind other than that of the legislature itself. Both the legislature and the people concur in the work, but because each contributed to the perfection of the statute, makes none the less the act of each legislation. The *Leges Regiæ* in Rome, under the kings, were proposed by the king, approved by the senate and confirmed by the *populus* in the *commitiæ*. It would hardly be contended that, under this system of legislation the people took no part in the legislation. Yet, in what respect does it differ from the scheme erected by the legislature whenever it submits the final question of the confirmation of a rule of civil conduct framed by itself to the people. It matters not whence the power originates, whether from the constitution of the state, as in Rome, or from a statute of the legislature, the authority itself is a power of legislation. When this is conceded all is conceded, for if it has its source in the legislature, then the inability of the legislature to confer is admitted.

The radical objection to legislation in this form is tersely stated by Chief Justice Ruggles, in his opinion in the case of *Barto* v. *Himrod*, decided in the Court of Appeals of New York, and reported in 8 *N. Y.* 483. An act for the establishment of free schools throughout the state, contained the proviso that the electors should determine, by ballot, at the annual election, whether the act should or should not become law. The chief justice said : " The event on which the act was to take effect was nothing else than the votes of the people on the identical question which the constitution makes it the duty of the legislature to decide. The legislature has no power to make a statute dependent upon such a contingency, because it would be confiding to others that legislative discretion which they are bound to exercise themselves, and which they cannot commit to any other man or men to be exercised. They have no more power to refer such a question to the whole people than to an individual. The people are sovereign, and their sovereignty must be exercised in the mode they have pointed out in the constitution. All legislative power is derived from the people; and when the people adopted the

constitution, they surrendered the power to make laws to the legislature, except in the single instance of contracting public debts."

As I regard the question, there is no logical escape from this view, and, as Judge Cooley admits, the weight of judicial authority is in the same direction. His language is : " If this question is to depend upon the weight of judicial authority up to the present time, it must be held that there is no power to refer the adoption or rejection of a general law to the people of a state, any more than there is to refer it to any other authority." *Cooley's Const. Lim.* 120.

An exception to this rule exists in the case of the acceptance of a grant of corporate powers by vote, and the reasons are pointed out in *City of Paterson v. Society*, 4 *Zab.* 385.

The same reasons which preclude the original enactment of a law from being referred to the people, make it equally incompetent to refer the question, whether an existing law shall be repealed. *Cooley's Const. Lim.* 121; *State v. Geebrick*, 5 *Iowa* 491; *Parker v. Commonwealth*, 6 *Penna. St.* 507.

My next proposition is that the local option feature of the statute under consideration is a delegation of the legislative function to a portion of the people of the state.

The operation of this act upon existing laws is manifested in the following manner : All licenses in the state for the retailing of intoxicating liquor are granted by virtue of the authority conferred upon the Court of Common Pleas by the first and second sections of the act concerning inns and taverns.

Certain limitation upon the method of exercising the licensing power is found in other sections, but the grant of power is in the two mentioned. It is perceived by a glance at the general act, that there is a general power in the court to grant licenses which will operate as a permission to sell in quantities less than a quart. The purpose of the present statute is to submit to the voters of a county, as a question of public policy, whether the power to grant licenses conferred by the general act, shall be suspended ; or, in other words, whether

the act shall be *pro tanto* repealed.    That this is the effect of
the present act, appears to me undeniable.    The act provides
for the ordering of an election in any county, at which election
the legal voters shall vote upon the question, whether intoxi-
cating liquors shall or shall not be sold.    The result of a vote
against the sale is declared by a subsequent section to be
that no license shall be granted within the limits of the county
so voting.    Its effect is exactly the same as if the act had read
that in the event of such a vote, the first two sections of the
act concerning inns and taverns should be repealed for three
years, and thence until another vote shall be taken, with a
different result.    This is a conspicuous instance of the sub-
mission of a repealing act to the people for their approval.
And if the preceding proposition is proven, it is a delegation
of legislative power.

But it is said that a different view can be taken of this
legislation which entirely relieves it of the character which I
have just ascribed to it.    The view so propounded is, that the
present act does not repeal or suspend a general act, but is a
mere regulation of the method of granting licenses.

The argument in favor of this view is the following: It is
admitted that the present method of granting licenses under
the general act is legally unobjectionable.    By the provisions
of that act, it is requisite that an application for a license shall
be accompanied by the recommendation of twelve freeholders
of the township, certifying to the character of the applicant,
to the equipment of the applicant's house for the entertain-
ment of travellers, and that the house is necessary and will
conduce to the public good.    If (it is argued) it is competent
for the legislature to require the recommendation of twelve
freeholders as a condition precedent to the granting of a license,
why may not the legislature require the recommendation of a
majority of the freeholders of a township, or a majority of the
legal voters of a township, and if of the township, why not of
the county?    And if the legislature can require a recommen-
dation in each application for a license, why may not the sen-
timent of a county, upon the question of granting any license

in the county, be ascertained by popular vote? This view has such a plausible appearance that I was at first inclined to yield my assent to its soundness, but upon reflection I am convinced that there is a line where the increase of the number of acquired approvers, and where the change in the method of ascertaining their sentiment, encounters a fundamental obstacle. That obstacle is that the scheme becomes one involving a submission to the people of the existence or non-existence of a statute, or the repeal or non-repeal of a statute.

I think no one can deny that if the admitted power of the legislature to require the recommendation of twelve freeholders, proves the existence of legislative power to submit the question of license or no license to the people of a county, it also proves its right to submit the same question to the people of a state. Yet it has the semblance of the absurd to say that such a provision is a mere regulation of the method by which courts exercise their functions under the inn and tavern act. For if the legislature passed an act providing that no intoxicating liquor should be sold in the state, and further providing that the act should not take effect unless ratified by a popular vote of the state, it would be a clear instance of the delegation of legislative power. If the legislature passed an act that no person should thereafter be licensed to sell intoxicating liquor in this state, with a proviso that the act should not take effect until ratified by a popular vote, the two acts would, in effect, be precisely the same. A failure to ratify would, in both instances, leave the present law, with all its provisions for licensing, untouched. A vote to ratify would, in both instances, involve an entire prohibition of the retail traffic in intoxicating liquor. As no one can sell without the license, the law which prohibits the licensing is of exactly the same import as the law which prohibits the sale. In dealing with questions involving the construction of statutes, we regard the intention of the law-maker and the result of the legislation, and words, however differently collocated, which mean the same thing, receive the same construction. If, then, the statute first mentioned involves the delegation of legislative function,

so does the second. Now, if an act which leaves the question of license or no license to the people of the state is of this character, why is not also one which leaves it to the people of a county?

The attempt to force the provision in the general act into an authority for the local option clause, must be a failure, because of the entire diversity of the objects which the respective provisions had in view. The provision for twelve approvers of the application under the general act, is designed as a rule of evidence, regulating the procedure of the courts in granting licenses. The approvers have nothing to do with the general policy of vending intoxicating liquors; this question had not assumed the moral shape which it now presents at the time the provision was enacted. That licenses would be granted was assumed by the law-makers. The court was to exercise their judgment as to the necessity of a licensed-house for the purposes of entertaining the traveling public and affording places for public meetings. In this, as in other instances, the legislature was compelled to invest the court with the exercise of discretionary powers in the administration of the law. The court could receive whatever evidence it might choose upon these questions. The court is bound by the statute to have some evidence before it can act. The recommendation is only evidence making a *prima facie* case that the statutory requirements had been filled. The public good, to which the approver certified, was the public advantage in these respects. It was far from the mind of the legislature that there was to be a certificate that the sale of liquor was for the moral exaltation of the community. It did not mean that any man should certify that the drinking of whiskey would conduce to the public good in the way of advancing ethical culture. The twelve approvers, as such, had no voice in respect to the general policy of granting licenses. The law reposed in no twelve men the power to say that any license or licenses should or should not be granted. They were witnesses whose testimony could be supplied by any other twelve freeholders and could be overcome by any other evidence. Their connection

with the subject ceased with the determination of the particular application to keep a particular house at a particular place.

Now, I cannot perceive that this provision bears any resemblance to one which submits the entire policy of licensing to the people at large. As an illustration of the difference, I remark that the legislature has the undoubted ability to enact that no one can be indicted or convicted for maintaining a public nuisance, unless such indictment and conviction is found on the testimony of at least six witnesses. Now would any one contend that this power proved that the legislature could leave to the people of a county to say whether the criminal law against nuisances should be suspended or repealed? The General Road act provides for the application to the Court of Common Pleas by ten freeholders for the laying out or vacation in a particular place of a public road, but does the existence of this provision prove that the legislature may remit to the people of a county the question whether the road law in the county shall be repealed?

In fact, neither the provision for ten applicants for a particular road, nor the assumed requirements of six witnesses before indictment, nor of the twelve freeholders' recommendation for license, are acts of legislation, but of administration only. And so, in respect to the matter submitted to the court, it has a discretion like any other court, but its discretion is judicial, and not legislative. But, whenever the legislature changes either of these provisions, so that it becomes a palpable scheme of legislation by the people, it runs counter to the constitution. I regard the present act as one of this kind.

The leading case in this country upon this point, as it is involved in the construction of licensing statutes, is that of *Rice* v. *Ross*, reported in 4 *Harr.* (*Del.*) 479. It was a case involving the identical question now under discussion. The legislature of Delaware, in 1847, passed an act providing that on a certain day the citizens of the several counties should decide, by their votes, whether or not the retailing of intoxicating liquors should be permitted in said county. The second section provided that the voters should ballot for license or no license.

The third section provided that if the vote should be no license, then no person should retail within such county, and no court should recommend any person for license. The cause was argued by Bayard and Clayton, and other leading counsel, before the Court of Errors and Appeals. The questions involved were exhaustively discussed in opinions by Chief Justice Booth, Chancellor Johns, and Justice Harrington. The court held unanimously that the statute was unconstitutional, because it delegated legislative power to the people of each county. Said Chief Justice Booth : " On each ballot is to be written or printed the words ' license ' or ' no license.' If there be a majority vote for no license, the several propositions contained in the act are by such majority enacted into a law, and the license laws are repealed. If a majority vote for no license, the propositions are rejected, and the license laws continue in full force. There is no substantial difference between this and the case of a bill introduced in either branch of the legislature. In the latter, the bill becomes a law by a majority of the votes of the members of each house. In the former, by a majority of the votes of the people of the county at an election." Similar language was used concerning a similar statute in the case of *Ex parte Wall*, 48 *Cal.* 279.

I regard these cases as presenting the correct view of statutes whose structures are similar to the one now under consideration, and as supporting my present view that the local option feature of this act delegates legislative power.

My next proposition is that the local option feature of the present act cannot be vindicated upon the ground that it is a delegation of the power of police regulation to a political corporation.

No one doubts the ability of the legislature to confer upon municipal corporations the right to exercise that somewhat undefined power inherent in the state, known as the police power. Nor is there any uncertainty as to the fact that comprised within this class of powers is the regulation of the sale of intoxicating liquors. Long before the formation of our constitution, the municipal corporations of Great Britian exer-

cised this power as one inherent in the grant of charter privileges to them by the sovereign. As early as 1667 it was ruled, in the case of *Player* v. *Jenkins, Sid.* 284, that if the number of taverns and ale houses increase in Cheapside, London, to so great an extent as to be a nuisance, they may be restrained by by-law.

Nor is there a doubt of the ability of the legislature to confer upon a municipal corporation the entire control and regulation of the sale of spirituous and malt liquors.

Nor have I a doubt of the unrestricted ability of the legislature to create municipal corporations. The legislature can invest the people within any territorial limits, whether the limits be co-incident with those of a county or not, with corporate functions. All this power is admitted. I, however, deny the insistence that an act which merely confers upon the people within a certain area the privilege of voting whether a general statute shall be suspended or repealed, invests such people with corporate functions.

The argument in favor of the view that this is a delegation of police power is, that none but a political corporation can receive such power; therefore, as the legislature can create corporations, it must be presumed when they conferred power which can only be exercised by a corporation, they meant to invest them with corporate functions. This argument means, that if the present act had, instead of providing for a vote by the people of the county, provided for a vote by the people of each congressional district, each district would have become, by force of the act, a political corporation with municipal functions. If the act had left the question to the people of East and West Jersey respectively, the State of New Jersey would have been divided into two municipal corporations. This view seems to me to be untenable.

Nor do I think that the argument in favor of this act as a delegation of police power to a municipal corporation is much strengthened by the fact that the territory, to the voters within which the question is submitted, happens to be a county. The county is, in no sense, a municipal corporation. It never

had any power to make by-laws concerning matters of police regulation, which power is inherent in the British municipalities. Now, admitting the power of the legislature to permit counties to create excise boards, or otherwise regulate the vending of liquor, it is clear that the legislature has never done so. Whatever other powers the county may have exercised, it has never exerted this. The power to license resides elsewhere than in the county government. In every city or town within the limits of a county, this power has been and still is confided to the city or town government. Within the county territory, not included within cities, the licensing power has been, and still is, in the Court of Common Pleas. But it is a mistake to speak of these courts as constituting a part of the governmental machinery of the county. They are, in no sense, municipal or corporation courts. They are state courts, organized in different subdivisions of the state for the purposes of the convenient administration of the laws of the state. And it is for the purposes of convenience to jurors, witnesses and suitors that their territorial jurisdiction is confined to the county limits. The judges are no more officers of the county, as a corporation, than is the sheriff, or surrogate, or county clerk. As to these last officers, it has been held that they are not corporation officers, for whose acts the county is liable. The truth is that the functions of a county organization and a municipal government are entirely different. The organization of the latter is for local and police purposes; of the former, to assist in the administration of the general laws of the state. As was said by the court, in the case of *Hamilton County* v. *Mighels*, 7 *Ohio* 109 : " With scarcely an exception, all the powers and functions of a county organization have a direct and exclusive reference to the general policy of the state, and are, in fact, but a branch of the general administration of that policy."

Now, this condition of affairs is significant to my mind, not as bearing upon the question whether a county is equipped to receive, or can be equipped to receive, a delegation of police power, but as throwing light upon the character of the present

act as disclosing whether it is a mere regulation of the manner of granting licenses, or is, as I contend, a power conferred upon the people of the county, in their sovereign capacity, to say that the general power to grant licenses shall be repealed. Upon this question it seems to me significant that the act still leaves the granting of all licenses to the same licensing bodies and courts as before; that it confides to no county officer any duty in respect to the exercise of this power. The county, as a corporation, having no power to license, and this act conferring no such power, how can it be said that it is a regulation of the licensing power conferred upon a county.

I think the weight of authority is against the view that an act like the present can rest upon this ground. The only case, I think, where a similar act has been supported, is that of *State* v. *Pond*, 93 *Mo.* 606. The opinion of a majority of the court in favor of the constitutionality of that act, was grounded upon the contingency theory, and not upon the theory of a delegation of police powers to a county. The cases cited on the argument in this case in favor of this legislation, were nearly all cases which were decided upon the contingency theory. If the contingency theory is unsound, whenever the contingency involves a delegation of legislative power, as I have endeavored to show, then the support of these decisions crumbles away. On the other hand, in the cases of *Rice* v. *Ross*, 4 *Harr.* (*Del.*) 479 ; in *Barto* v. *Himrod*, 8 *N. Y.* 483 ; *Santo* v. *State*, 2 *Iowa* 165 ; *State* v. *Weir*, 33 *Iowa* 134 ; *Ex parte Wall*, 48 *Cal.* 279 ; *Swisher* v. *Texas*, 17 *Tex.* 441, the legislation was held void, because it delegated the law making power to the people, and it was not thought that the question of the delegation of police power to a municipality was involved at all. I shall leave this branch of the case without further remark, because I am satisfied that if the constitutionality of this act could have been resolved in its favor upon this ground, had the act been passed previous to the adoption of the amended constitution, it now encounters an unsurmountable difficulty, which I state in my next proposition.

My fifth proposition is, that in whatever light this legisla-

tion can be viewed, it is special and local, and regulates the internal affairs of either counties or cities.

The familiar section of the constitution to which I allude is paragraph 11 of section 7, and it prescribes that the legislature shall not pass any private, special or local law * * * regulating the internal affairs of towns or counties. ,

It is not necessary to discuss the general scope of this provision. It has been the subject of construction and application in so many cases that its force, as a rule of legislative restriction, is well defined and limited. It may be stated, as the result of numerous adjudications, that a general law is one that operates with equal force upon all subjects within a class, the classifieation being made in respect of the subject-matter of the legislation. Now, my position is, that the act, whether it is viewed as one leaving to the contingency of a popular vote in a county the repeal of an existing law, or whether it is regarded as an additional limitation upon the licensing power administered by the courts, in either aspect, it operates with unequal force upon the regulation of an internal affair of a county or a city.

I will first discuss the legislation as I have regarded it, namely, as an act providing that if the people of any county so declare by a popular vote, the inn and tavern act shall be suspended. For the purposes of this argument, I will assume that the general act regulates an internal affair of a county. Now, I presume that no lawyer would argue that if this act had provided that the general inn and tavern statute should be repealed in certain counties in this state, it would not be a special and local, and, therefore, unconstitutional enactment. And I presume that no one would deny that, by reason of the popular vote which this act contemplates, the general law may become operative in one county and inoperative in another. In both instances the repeal is effected by a law of the state repealing another law of the state; only, in the first of the instances, the legislature says what counties shall be affected by the repealer, and, in the second instance, the people of the respective counties decide it. Now, the inquiry naturally sug-

gests itself, wherein lies the difference between the two instances in respect to the generality of operation. The force of the legislation in its effect upon some, and not all, of the counties of the state is precisely the same. If, therefore, the special character of the first statute is manifest, how is the general character of the second demonstrated? Here comes in again the contingency theory as an explanation of the way the latter act evades the charge of specialty. "The law was perfect when it came from the hands of the legislature; the law made the provision for the vote, and the vote did not make the law. The provision for the vote was the contingency upon which the law was to take effect. The perfect law provided that all counties should vote; therefore, it applied to all counties alike, and, therefore, it is general legislation." A specimen of this line of reasoning is found in the case of *State* v. *Wilcox*, 45 *Mo.* 458. Missouri is one of the states whose constitution contains a provision against special and local legislation. The case of State *v.* Pond, already mentioned, held that a statute of that state which submitted the question of the sale of liquor to the voters of a county, was not local, and grounded the decision on the authority of *State* v. *Wilcox, supra.* In State *v.* Wilcox, the court said: "The legislature cannot propose a law and submit it to the people to pass or reject it by a general vote. That would be legislation by the people. But the proposition cannot be successfully controverted that a law may be passed to take effect upon the happening of a contingency * * * The law is complete and effective when it has passed through the forms prescribed for its enactment, though it may not operate, or its influence may not be felt, until a subject has arisen upon which it can act. * * * Every county in the state may avail itself of the privilege offered by the law by a majority vote of the people."

I have cited the pith of the argument of the judge to show that the generality of the law is rested upon the doctrine of the right to pass acts to take effect upon a contingency. I have already discussed the soundness of this theory, as applied to illegal contingencies, one of which, in my judgment,

is a delegation of legislative power.   In addition to what has been already said, under a former head, I remark upon the admission in the above opinion, that the legislature cannot propose a law, and submit it to the people, followed by the assertion that they can make such an act dependent upon a contingency, although such contingency is a vote of the same people.   This distinction is to me unperceivable.   The fallacy of this argument is, that the law has no force until approved, and never can be operative upon any prescribed condition of affairs till it has the sanction of popular approval.   The law has no operative force until after the vote.   It then springs into life, and for the first time, operates upon the real object of its being, which in this case is the suspension of the power to license.

Nor can I conceive of a more conspicuous instance of its fallacy than its operation, in view of the constitutional clause now under discussion prohibiting local and special legislation. It has been said that in the consideration of legislative acts we must look at its results.   I entirely assent to that view. Let us glance a moment at the power which the admission of the right to submit a law to the approval of the people of cities and counties confers.   I venture the assertion, that an ingenious draftsman of statutes can provide a different special charter for every city in the state, and a different government for each county and township.   For an instance, take the police tenure of office act.   An act general in form may be passed, providing that all policemen shall hold their terms. for five years; another act, that they shall hold their office at the will of the common council, and still another, that they shall hold during good behavior.   And so on in a dozen different shapes, but each act provides that it shall not become operative in any city until accepted by a majority of the votes of the people of said cities.   One city votes to accept one act, another city votes to accept another act, and a third city still another act, and so on until in each city there is a different law for each one of the classes.   Each act, when so accepted, becomes a part of the charter of the accepting city.   Now,

what is true of the operation of this rule in respect to the police branch, is true of any other branch, and so every department of a city's government may be organized by a law controlling the same department, but differing from that of any other city. What more can be accomplished by any species of local or special legislation? This doctrine leaves in full flower the noxious features which the constitutional provision was designed to extirpate. It leaves the same endless variety of charters to be construed, and relieves the body of legislators from all legislative responsibility. These were the principal evils which, as pointed out in the opinion of *Van Riper* v. *Parsons*, 11 *Vroom* 1, were to be cured by the constitutional amendment. One city may apply for any kind of legislation, and all other cities, knowing that it cannot affect them without their vote, have no interest in watching or limiting the legislation.

It seems to me that the fallacious foundation of this doctrine of generality, resulting from the power of all cities to vote for or against a law, is demonstrable by a single illustration. It has been advanced as a reason for the submission of legislation to the approval of the people, that legislators are bound to carry out the wishes of their constituents, and to do so they must ascertain their sentiments, and that one way, as good, if not better than any other, is by a vote of the people upon the policy of the legislator. In this view, the vote is only for the purpose of enabling the legislator to meet the views of those who elected him. Now, suppose that before the passage of an act, the views of the people of the different municipalities which would be affected by its enactment should be taken by vote; suppose, that after the ascertainment of the sentiment of the people, an act was passed to operate only upon those who had expressed an approval of the legislation, and not upon others. No one would for a moment contend that the latter was a specimen of general legislation. Therefore, generality depends upon whether the approval is expressed before or after the passage of the act.

The constitutional provisions in reference to special legisla-

tion are of comparatively recent growth, and the adjudications on the point now involved are not numerous, but the doctrine of the following cases is squarely against the constitutionality of this legislation. In the case of the *People* v. *Cooper*, 83 *Ill.* 585, the legislature attempted to confer upon the council of a city the power to assess and collect taxes through certain officers named therein, or through certain other and different officers, named in the general incorporation act. An option was conferred upon the city council to have either one of the two sets of officers for the purpose named. The act was held invalid as establishing dissimilarities in the power and mode of different cities in the levy and collection of taxes, and so was special and local. The principal is the same as I have applied in the present case. There is here an existing law providing for licenses. The present act confers upon the people of the county the option of saying whether the old or the new shall be the prevailing system. In the case of the *City of Scranton School District et al.* v. *Lackawanna Iron and Coal Co.*, 4 *West. Rep.* 311, a supplement to a tax act provided that no city of the third class, nor any city of less than ten thousand, heretofore incorporated, shall become subject to the foregoing provisions of this act until the same be accepted by an ordinance. Mr. Justice Green, in delivering the opinion of the Supreme Court of Pennsylvania, said: "According to this, those that do accept will be subject to the methods of assessment and collection prescribed by the first five sections, and all those that do not will not be so subject, and as to them different methods will prevail. Whether the methods prescribed by the act shall be the law, depends, not upon the terms of the legislation, but upon the will of others who are not law-makers at all, and what may be law in one city of the third class would not be law in another city of the third class. "

These cases are authorities, because the taxing power, like the power of police regulation, may admittedly be conferred upon municipal corporations. *Dillon on Mun. Cor.*, § 590. So there is no dissimilarity in principle in that respect. The

Paul v. Gloucester County.

power of a city government to accept an act of this kind stands upon the same footing as the power of the people to accept, for it must be kept in mind that the generality of the operations of these acts rest upon the fact that all cities may accept, and so all are placed in the same posture.  The invalidity of the Pennsylvania act is not put upon the ground that the people, and not the common council, may be empowered to accept, but upon the ground that the power to accept, by either people or common council, is a power to create differences in municipal affairs.

In the case of *Maize* v. *State*, 4 *Ind.* 342, the act provided that a vote be taken on the license question in townships, and if the vote was adverse, no license should issue. The act was held unconstitutional upon the ground that it was special.  This branch of the case was approved in the subsequent case of *Meshmeier* v. *State*, 11 *Ind.* 482.  The doctrine of these cases has never been overruled, although the case of *State* v. *Groesch*, 42 *Ind.* 547, was improperly distinguished from the preceding cases.

In the case of *Geebrick* v. *State*, 5 *Iowa* 492, an act authorized the county judge to issue licenses.  A section provided that the existing prohibitory law should not be repealed unless the people of each county should vote in favor of the last act, and if they so voted, then the judge should grant licenses.  The court, after holding that a law can no more be repealed than it can be made by a vote of the people, said : " The prohibition liquor law is a law of a general nature, and its operation must be uniform throughout the state.  Can they say that such is the case if it remains in full force in one county while it is repealed in others by a vote of the people and a license law adopted in its stead ? "

In the case of the *State* v. *Wier*, 33 *Iowa* 135, an act made it unlawful to sell ale, &c., except as provided in a general act for the sale of spirituous liquors.  Another section provided that the adoption of the act should be submitted to the voters of a county, and if a majority was for prohibition, then the latter act was to be in full force.  The court said, " The effect

of a vote in favor of the act of 1870 is to adopt a provision in direct conflict with the law of 1853, and hence to repeal it by necessary implication.    It falls so completely within the principle and reasoning of Geebrick *v.* State that it seems only necessary to refer to that case to show the unconstitutionality of the act in question."

With the citation of these cases, I leave this branch of the case with a remark in regard to a difficulty which has been suggested if we deny to cities the power to accept general acts.    It is said that if you do this it becomes impossible to delegate power to cities and towns at all, for, it is said, you must hold special all the diversities of municipal government which arise from a different exercise, by different cities, of the same power.    But there is no difficulty upon this ground. An act to confer upon all cities the power to regulate the sale of liquors would be entirely valid.    Nor would it matter that the common council might, in different cities, prescribe different regulations by ordinance.    But this is entirely different from the legislature by statute making one regulation for one city and a different regulation for another city, or permiting one city to accept one scheme while another city has another. The difference is, that in the one instance the diversity arises from the regulation, exercised by a municipality, over a class of subjects which custom has sanctioned, or which, by usage antedating the constitution, the legislature could confer upon them.    To regulations of this kind the constitution does not apply ; the language of the constitution is, that the *legislature* shall not pass special laws.    It is when a statute regulates directly that the constitutional rule applies.    And an act which becomes operative upon approval of a common council is a statute and not an ordinance.    It is a legislative act and not a municipal regulation ; it is amenable to the constitutional rule while the municipal ordinance is not.    My conclusion is, that, regarding this feature of the act as one providing for a suspension or partial repeal of a general act by the test of a popular vote, it is local and special legislation.

Again, if this feature of the act is regarded as providing

for a mere additional limitation upon the licensing power, I do not see how it escapes the restrictive words of the constitution. Within the limits of nearly all, if not all, of the counties of the state are cities, or towns clothed with a complete local government. Among the other powers confided to them is that of regulating the sale of liquor, which is exercised usually by licenses granted by some branch of the municipal government. The fees arising from such licenses are paid into the municipal treasury, and the whole scheme of licensing is a municipal affair. Now, all the cases from the *Bingham* v. *Camden*, 11 *Vroom* 156, to *Hightstown* v. *Glenn*, 18 *Vroom* 105, and *Closson* v. *Trenton*, 19 *Vroom* 438, (the last affirmed in this court), have declared that the licensing power is an internal, municipal affair. These cases have declared, with equal unanimity, that all statutes which touch this power must apply a uniform rule. Now, take the theory of regulation applied in the construction of this statute. Upon this theory the present act does not strip cities and towns of the power to grant licenses. It only regulates the method by which licenses are granted. It only requires the recommendation of a majority of the voters in a county instead of twelve freeholders.

But can the legislature say that one city may grant licenses upon the recommendation of twelve men, and another city upon the recommendation of fifty? Yet this law permits Cape May City to grant a license upon the approval of less than twelve hundred voters, while Salem cannot license without the approval of twenty-six hundred.

Further than this, the standard is not a municipal but a foreign standard. It does not provide for the approval of voters or freeholders of a city, but partly of voters resident beyond the limits of the corporation. So it is a regulation of municipal affairs, but its operation varies, not with the size or circumstances of the city itself, but varies with the population of an outlying territory which happens to be contiguous. If this is not special legislation, I have not learned the mean-

ing of the term or caught the significance of our own adjudication upon the subject.

For reasons which I have thus expressed at greater length than I intended, I am constrained to vote to reverse the judgment of the Supreme Court.

*For affirmance*—THE CHIEF JUSTICE, DEPUE, DIXON, MAGIE, SCUDDER, VAN SYCKEL, CLEMENT, PATERSON.    8.

*For reversal*—THE CHANCELLOR, KNAPP, REED, BROWN, COLE, McGREGOR, WHITAKER.    7.