[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 193 
The main question presented by these two appeals is: Does our law require a street railway company which has substituted trolley buses for trolley cars, to obtain municipal consents before making the further substitution of auto buses in place of the trolley buses? The respondent, Public Service Coordinated Transport, has obtained the approval of the Board of Public Utility Commissioners for the use of auto buses in lieu of trolley buses on two lines where formerly it operated trolley cars; but it has not procured the consent of the municipal authorities for the operation of the auto buses. The respondent relies on P.L. 1946, c. 71, which amended R.S. 48:15-41 by adding thereto the following paragraph:
"* * * Whenever the Board of Public Utility Commissioners has approved * * * the substitution of vehicles of the character described herein (trolley buses) on any line (of street railway) or part thereof, the company operating any such line may, from time to time, with the approval of the Board of Public Utility Commissioners, utilize in lieu of such vehicles, auto buses in the operation of any such line or part thereof."
The express requirement that the Public Utility Commissioners give their approval before auto buses can be used *Page 194 
in lieu of trolley buses, tends to negative the necessity for securing permission from any other governmental body, such as the board having control of the streets in the municipality. Paul v.Gloucester County, 50 N.J.L. 585 (E. A. 1888). On the other hand, many provisions in our statutes point the other way. The Traction Company Act of 1893 which authorizes the use of "motors, cables, electrical or other devices and appliances" for the traction of the cars, permits a change from one kind of motive power to another only with the consent of the proper municipal authorities. P.L. 1893, c. 172; P.L. 1896, c.
192; R.S. 48:15-10 (IV) 35 and 36. The Kates Act, adopted in 1916, forbids the operation of an auto bus without consent of the body having control of the streets in the municipality. P.L.
1916, c. 136; R.S. 48:4-3. An amendment added to the Home Rule Act in 1918 gives municipalities broad power to license and regulate buses. R.S. 40:52-1. In 1925, street railway companies were given the right to own and operate auto buses upon obtaining municipal consents such as are required by the Kates Act, and the approval of the Public Utility Commission. P.L. 1925, c. 244;R.S. 48:15-37. Three years later such companies were permitted to substitute auto buses for street railway service but again they were required to obtain municipal consent for the bus operation. P.L. 1928, c. 52; R.S. 48:15-38.
About this time there was being developed the trolley bus, a vehicle not running on a track, that can be powered both by electricity received from an overhead wire and by a motor or engine in the bus. Street railway companies were authorized byP.L. 1934, c. 124; R.S. 48:15-41, upon receiving the approval of the Public Utility Commissioners, to substitute trolley buses for trolley cars. This statute may be said to mark a change in legislative policy, for it does not require municipal consent. It is the 1946 amendment to this statute that authorizes the substitution of ordinary auto buses for trolley buses. During the past 30 years, auto buses have been winning an ever larger place in the transportation field. They have proved their superiority to street cars and even to trackless trolleys. We may readily understand why the *Page 195 
Legislature would facilitate the transition to auto buses — from vehicles dependent on a distant powerhouse and expensive transmission lines, to vehicles carrying their own power plant. We are satisfied that the Legislature, when enacting the 1946 amendment, intended that the operation of auto buses in substitution for trolley buses, should not be subject to the approval of the municipal authorities.
The appellants, who own and operate buses in competition with respondent, argue that the statute, at least as applied in this case, violates both the Constitution of New Jersey and the Constitution of the United States, in that it deprives appellants of the equal protection of the law. The essence of their argument is that the statute permits the respondent to operate auto buses without obtaining municipal consents while it forbids appellants to do so. But the respondent, in order to establish its street car line in the first place, had to obtain approval of both the governing body of each municipality through which the line ran and of the boards or bodies having control of the streets, and it had to secure the consent of the owners of one-half the property along the proposed street railway line. These conditions were far more onerous than those that appellants had to meet. Now the respondent is permitted to substitute auto buses for the trolley buses just as the appellants may substitute new buses for old, without securing another municipal consent. The statute does not violate any constitutional right of the appellants.
The respondent questions the standing of the appellants relying on such cases as Public Service Railway v. Reinhardt,92 N.J. Eq. 365; 93 Id. 461 (E. A. 1921). In short, we have concluded that the appellants are within the scope of R.S.
48:4-11 which provides: "Proceedings to prevent a person from operating an auto bus without a valid municipal consent may be instituted by any public utility, the business or revenues of which are adversely affected thereby."
The decisions of the Board of Public Utility Commissioners are affirmed. *Page 196